727 A.2d 1055 (1999)
320 N.J. Super. 558
Frank L. ROACH, Plaintiff-Respondent,
v.
TRW, INC. Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 1, 1999.
Decided May 4, 1999.
*1056 Kenneth J. Kelly, New York City, for defendant-appellant (Epstein, Becker & Green, attorneys; Mr. Kelly, of counsel, Mr. Kelly and Mark D. Lurie, Newark, on the brief).
Gregory S. Schaer, Newark, for plaintiff-respondent (Kenney, Schaer & Martin, attorneys; Mr. Schaer, of counsel and on the brief).
Before Judges PETRELLA, D'ANNUNZIO and COLLESTER.
The opinion of the court was delivered by D'ANNUNZIO, J.A.D.
Defendant TRW, Inc. (TRW) terminated plaintiff Frank L. Roach's employment in late 1992 during a corporate reorganization necessitated by shrinking government spending, particularly spending on national defense. The evidence establishes that employment in TRW's space and defense sectors dropped from 16,000 employees in 1989 to 9,000 in 1994. Roach, however, contended that TRW terminated him in violation of the Conscientious Employee's Protection Act (CEPA or the Act), N.J.S.A. 34:19-1 to 8, because he had disclosed to company superiors certain alleged activities of two co-employees. After the trial court denied TRW's motion for summary judgment on the CEPA claim, the case was tried to a jury. The jury determined that TRW had violated CEPA by terminating Roach's employment because Roach had disclosed and objected to "illegal unethical activities." The jury determined, however, that the activities Roach had disclosed were not "incompatible with a clear mandate of public policy." It awarded Roach $287,000 in lost wages, $342,700 in future lost wages, and $75,000 for pain, suffering and emotional distress. The court calculated pre-judgment interest to be $131,961.72 and awarded plaintiff counsel fees and costs, including a contingency enhancement of twenty-five percent, in the total amount of $158,756.90. TRW appeals.
Roach left the army in 1981 and was employed by TRW. His first assignment was in TRW's security department. Although Roach's testimony is unclear, it appears that the security involved protecting TRW's secrets, including classified information provided to TRW by the United States. Roach also worked in the area of proposal administration. In that job, Roach participated in the preparation of TRW responses to the United States' requests for proposals. Roach did not have technical training and it appears from his testimony that his involvement was more of a coordinator, assuring that the various technical people *1057 timely prepared responses to the government's requests and compiling the responses in preparation for their presentation to the government. Roach's next assignment at TRW involved the preparation of TRW's code of ethics.
In 1990, Roach became interested in transferring into marketing. He applied for the position of district office marketing manager in the Fort Monmouth, New Jersey office of TRW's Electronic Systems Group (ESG). Various people interviewed Roach in late May and early June of 1990 regarding his application. TRW's appendix contains interview records prepared by five interviewers. Each of the five interviewers recognized that Roach lacked experience in marketing and lacked technical qualifications. Only one of the five interviewers recommended that the job be given to Roach. Roach, however, was hired.
Roach began his work as district office manager of ESG in 1990. The job description is vague, but it appears that Roach's function was to make contact with and establish personal relationships with the Electronic System Group's customer base, i.e., the United States military. One of the purposes of these contacts was to glean information regarding the customer's needs and opinion of TRW's performance. The development of information regarding TRW's competitors was an additional goal.
Charles A. Briggs was Roach's superior in ESG. Briggs' office was in Washington, D.C. In May 1991, Briggs prepared a performance appraisal regarding Roach's job performance. Briggs stated:
Frank is very conscientious and adapting to a new profession. His achievements are noted in section III[1]. Frank must attempt to communicate more often with his supervisor. Frank needs assistance in establishing priorities. He needs assistance in dealing with the customer in sensitive areas. This is just a matter of technique. Frank is growing into his job and has a bright future.
Briggs also stated that Roach should "take a marketing coursenot Wharton. Something DOD [Department of Defense] oriented. He should spend a day in Washington every month with his supervisor."
Briggs prepared another performance appraisal regarding Roach in March 1992. At that time, Briggs stated:
Frank has done a fine job in his newly chosen career path in marketing. He assisted in our MIMIC award success and has since significantly contributed to the MIMIC team. Frank must continue to work on being a "communicator" and use good judgment in selection of trips, customer meetings and management interface.
Under Section VI, "Development Needs," Briggs stated that "Frank and I should jointly decide on a marketing seminar for him to attend in 1992."
TRW issued a company newsletter called The Sentinel. On August 6, 1992, The Sentinel published a "special bulletin" signed by TRW's chairman and chief executive officer and its president and chief operating officer. In it, TRW announced a reorganization of its space and defense sector. One of the goals of the reorganization was to "reduce staff with more clearly defined roles." Of particular relevance to this litigation was the announcement that the Electronic Systems Group, in which Roach was employed, and the Space and Technology Group were to be combined "into a single operating group." The bulletin noted that "it is expected that a number of current activities will be combined or eliminated." A transition team was announced and one of its responsibilities "will be to determine organizational roles and responsibilities, staffing levels, selection criteria for key positions, and other organizational realignment issues." The changes were to be effective January 1, 1993.
The Sentinel published another special bulletin on September 3, 1992, announcing the organizational structure "for the new TRW space and electronics group, to be effective January 1, 1993." This new group was the combination of Roach's Electronic Systems Group and the Space and Technology Group.
*1058 It was apparent from both bulletins that jobs were to be eliminated.
Frederick Brown, a TRW executive, was assigned to head the new Space and Electronic Group's program development and planning organization. In a memo dated October 12, 1992, Brown asked nine individuals, including Briggs, "to evaluate the marketing people and the accompanying secretarial support from the set of personnel formed by combining the S & T G [Space and Technology Group] and E S G marketing organizations." The memo included evaluation criteria and an explanation of the evaluation process. The addressees of the memo were instructed to evaluate "only those people whose performance we know well enough to judge their capability and ability to execute their function." The addressees were asked to evaluate the personnel as superior performers, above average performers, average performers or below average performers.
In addition to evaluating past performance, Brown asked the evaluators to "use an arrow in a separate column to indicate the expected future performance or contribution of each person." An arrow going up indicated effectiveness in the future. A flat arrow indicated continued acceptable performance, and a down arrow indicated an "inability to meet the challenges of the future."
Only two people, Charles Briggs and David DiCarlo, evaluated Roach. Briggs evaluated Roach as a "three," an average performer, with no arrow. DiCarlo gave Roach a "four," indicating a below average performer. Di-Carlo also gave Roach a down arrow. Roach's average score, therefore, was 3.5 with a flat arrow. Out of thirty-seven people, Roach scored thirty-seventh.
As part of the reorganization process, Tim Hanneman, Brown's superior, had instructed Brown to trim staff by thirty percent. Brown was reluctant to do that and, therefore, Brown prepared two plans. The first plan reduced the staff by twenty-five percent, but the second plan complied with the thirty percent requirement. In the first plan, Roach had a job. Roach did not have a job in the second plan. Brown testified that he presented the first plan to Hanneman, but Hanneman instructed Brown that thirty percent meant thirty percent. Roach received his layoff notice on November 3, 1992.
We observe that the evidence establishes an irony in the reorganization process. Brown did not know Roach and many others in the group he was now going to head. Accordingly, Roach and other personnel were invited to meet Brown at his California office to give Brown an opportunity to get acquainted with them. During this meeting, Brown understood Roach to have proposed that the work of the ESG's Fort Monmouth district office could be handled by a person working out of the Washington D.C. area where the group already had an office. In other words, instead of there being two district office managers, there would be only one. Roach suggested that he be given the D.C. job from which he would also handle the Fort Monmouth business. In addition to his New Jersey home, Roach also had a home in suburban Virginia, and in his presentation to Brown, Roach stressed that TRW would have no relocation expenses. Brown testified that, in fact, the ESG Fort Monmouth office was eliminated and the Fort Monmouth business handled from the Washington D.C. office. However, Roach did not get the job. Brown testified that there were many people more qualified than Roach in marketing TRW's technical business.
Roach contends, however, that he was terminated because in late 1991 he made certain allegations regarding two co-employees, Jim Vrungos and Vern DeBord. Roach testified that Fran Kruse, DeBord's secretary, was the source of his information about Vrungos and DeBord. In his testimony, Roach described Fran Kruse in unflattering terms. He said that she had always been a disruptive influence in the office and described her as a pathological liar. Nevertheless, Roach chose to rely on information Kruse gave to him. Kruse told Roach that she was giving him the information because she believed that DeBord was preparing to fire her. According to Kruse, DeBord and Vrungos had an interest in a company called Nations, with which TRW did some type of undefined business. Kruse told Roach that if TRW acquired *1059 Nations, Vrungos and DeBord would enjoy a financial windfall.
The second allegation involved TRW's leasing of a computer from Power Lease, Inc. The lease was for three years and involved approximately $4,000 over the three-year period. According to Kruse, the lessor was a subsidiary of a corporation in which DeBord had an interest. The record also contains testimony that DeBord's son may have been an executive with the lessor corporation.
There is very little support in the record for the truth of the allegations that Vrungos and DeBord were engaged in acts disloyal to their employer. The allegations were based in substantial part on hearsay, speculation, innuendo and office gossip. There is nothing in the record to indicate that TRW paid in excess of market value for the computer lease. There is also an allegation that TRW purchased a surge protector and back-up energy supply for $411 through Power Lease, Inc. There is nothing in the record to indicate that TRW overpaid for that item.
Regarding Nations, Inc., the record contains a memorandum from DeBord to Vrungos dated October 3, 1988. It stated:
On September 8, 1988, Mr. Witkowski, Executive Vice President of Nations, Inc. one of TRW's subcontractors on Maneuver Control System Integration and Engineering contract, and a company SEDD is considering acquiring, informed me of the following conversation.
According to Mr. Witkowski, Gene Proctor told John Pla, President of Nations, that he should forget about TRW acquiring Nations. He stated that Vern DeBord and Jim Vrungos were not smart enough, nor had the wherewithal to get TRW to seriously look at acquiring them. I asked John Pla if Mr. Proctor has made a statement to that effect and he assured me he had. Mr. Pla and Mr. Witkowski assured me that they would not hold it against us, but were surprised of how Gene Proctor spoke of his counterparts at TRW in such a derogatory manner. Both Mr. Pla and Mr. Witkowski stated they would be glad to talk to anyone at TRW and repeat the conversation.
We need to take the appropriate action to prevent reoccurring incident of this nature. Please advise me of the next step.
This memorandum, written three years before Roach made his disclosures, does not support an inference that Vrungos and De-Bord were financially interested in Nations, Inc. In any event, TRW never acquired Nations.
Roach informed his superior, Charles Briggs, of these allegations in the fall of 1991. Briggs informed Vrungos and placed a three-way conference call involving Roach and Vrungos. Roach testified that he was surprised that Briggs had informed Vrungos. Roach testified that he was told that this was a gray area and nothing was done about his allegations.
As a result of his frustration, Roach called the TRW "hot line." The hot line is staffed by TRW lawyers and is designed to facilitate the communication of complaints about wrongdoing within the company. Roach informed Tom Wagner, a TRW lawyer assigned to the hot line, about his allegations regarding DeBord and Vrungos. Roach also added allegations that DeBord had padded his expense account by $15 for a lunch bill which Roach had paid. Roach testified that he later found out that his hot line call had "fallen through the cracks" and that no investigation had been mounted. According to Roach, when Briggs learned that Roach had called the hot line, he became angry. Briggs, however, did not learn about the hot line call until after Roach had received his layoff notice.
The evidence establishes that as a result of the reorganization, Briggs retired and De-Bord and Vrungos left TRW.
N.J.S.A. 34:19-3 (hereafter section 3) is the heart of the Act. It provides:
An employer shall not take any retaliatory action against an employee because the employee does any of the following:
a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer or another employer, with whom there is a business relationship, that the employee reasonably believes is in violation of a law, or *1060 a rule or regulation promulgated pursuant to law, or, in the case of an employee who is a licensed or certified health care professional, reasonably believes constitutes improper quality of patient care;
b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer or another employer, with whom there is a business relationship, or, in the case of an employee who is a licensed or certified health care professional, provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into the quality of patient care; or
c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
(1) is in violation of a law, or a rule or regulation promulgated pursuant to law or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care;
(2) is fraudulent or criminal; or
(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.
[Emphasis added.]
CEPA defines "retaliatory action":
"Retaliatory action" means the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment.
[N.J.S.A. 34:19-2e.]
As previously indicated, the jury determined that TRW had violated CEPA by terminating Roach because he had disclosed illegal activities, section 3a, and because Roach had objected to those activities, section 3c(1). TRW contends that CEPA does not protect Roach's disclosures and "objections" and, therefore, the trial court should have granted TRW's motion for summary judgment, its motions for judgment at trial and its motion for judgment notwithstanding the verdict. We agree and reverse.
Our Supreme Court has addressed CEPA on several occasions. In Abbamont v. Piscataway Bd. of Educ., 138 N.J. 405, 650 A.2d 958 (1994), the Court described CEPA as protecting "whistleblowers," i.e., a person "`who, believing that the public interest overrides the interest of the organization he [or she] serves, publicly "blows the whistle" if the organization is involved in corrupt, illegal, fraudulent, or harmful activity.'" Id. at 417, 650 A.2d 958. The Court also noted Governor Kean's explanation of CEPA's objective to protect conscientious employees from "firing, demotion, or suspension for calling attention to illegal activity on the part of his or her employer." Id. at 417-18, 650 A.2d 958.
Abbamont involved retaliatory action against an industrial arts teacher who persistently criticized the "poor health and safety conditions of the metal shop, including broken machines, lack of air ventilation, inadequate lighting, and slippery floors." Id. at 410, 650 A.2d 958. The Court determined that the record established plaintiff's "reasonable belief that the conditions in the metal shop were in violation of an administrative `regulation promulgated pursuant to law' and were contrary to `a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.'" Id. at 423, 650 A.2d 958. Thus, Abbamont involved sections 3a and 3c(3).
In Barratt v. Cushman & Wakefield, 144 N.J. 120, 675 A.2d 1094 (1996), the Court affirmed the Appellate Division's reversal of a summary judgment dismissing plaintiff's CEPA claim. Barratt, the plaintiff, was employed by Cushman as a broker-salesperson. He informed the New Jersey Real Estate Commission that a person named Schaffel had engaged in acts of commercial bribery seven years earlier. Schaffel was a partner in a partnership that owned commercial real estate. Cushman was the partnership's leasing broker when Barratt made the disclosure. As a result of Barratt's disclosure, Cushman fired him to protect Cushman's relationship with the partnership.
The Court held that plaintiff's CEPA claim was actionable under the 1989 amendment to *1061 CEPA which protected employees from retaliation for disclosure about an unlawful activity of "`another employer, with whom the employee's employer has a business relationship.'" L. 1989, c. 220, § 1; section 3a. Id. at 128, 675 A.2d 1094. The court noted that "[t]he aim of the bill is to discourage collusion between employers for the purpose of inhibiting disclosure by their employees of violations of law committed by either employer." Ibid.
In Mehlman v. Mobil Oil Corp., 153 N.J. 163, 707 A.2d 1000 (1998) the Court affirmed our decision reversing the trial court and reinstating a jury verdict in plaintiff's favor on his CEPA claim. Plaintiff, Mehlman, "a renowned toxicologist," id. at 167, 707 A.2d 1000, had been employed as defendant's Director of Toxicology and Manager of Mobil's Environmental Health and Science Laboratory. The jury found that Mobil had discharged Mehlman "in retaliation for his objection to the sale by ... Mobil's Japanese subsidiary, of gasoline containing levels of benzene in excess of five percent." Id. at 166, 707 A.2d 1000.
The Court described benzene as "a dangerous and toxic chemical used as an additive in gasoline." Id. at 169, 707 A.2d 1000. The Court noted that "the record contains substantial evidence that, combined with representations by counsel, persuasively suggested that gasoline with more than five percent benzene was hazardous to human health." Id. at 173, 707 A.2d 1000. Gasoline sold in the United States must contain less than one percent benzene; gasoline sold in the European Economic Community may not contain more than five percent benzene. When Mehlman expressed his objection to the benzene content of Mobil's gasoline in Japan, no Japanese statute or regulation prohibited the sale of gasoline with more than five percent benzene. Japan adopted such a regulation in 1991, approximately two years after Mobil terminated Mehlman. However, the Japanese Petroleum Association prohibited the sale of gasoline with five percent or more benzene. The Court held that the Association's guideline "constituted a clear mandate of public policy." Id. at 192, 707 A.2d 1000.
The Court held that whether an employer's activity violates a clear mandate of public policy under N.J.S.A. 34:19-3c(3) is a question of law to be decided by the court as an issue of law. Id. at 187, 707 A.2d 1000. The Court ruled that
In our view, the sensible meaning of CEPA is that the objecting employee must have an objectively reasonable belief, at the time of objection or refusal to participate in the employer's offensive activity, that such activity is either illegal, fraudulent or harmful to the public health, safety or welfare, and that there is a substantial likelihood that the questioned activity is incompatible with a constitutional, statutory or regulatory provision, code of ethics, or other recognized source of public policy. Specific knowledge of the precise source of public policy is not required. The object of CEPA is not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful or indisputably dangerous to the public health, safety or welfare.
[Id. at 193-94, 707 A.2d 1000.]
Finally, the Court held that a CEPA claim could be maintained based on the violation of a foreign jurisdiction's public policy. Id. at 195-96, 707 A.2d 1000.
CEPA, in section 3a, prohibits retaliation for disclosures of "an activity, policy or practice of the employer ...[which] is in violation of a law, or a rule or regulation..." Abbamont, Barratt and Mehlman clearly involved complaints regarding actions of the employer. In Abbamont, it was the employer's failure to provide a safe school environment; in Barratt, the employee accused the secondary employer of commercial bribery; in Mehlman, the employer was selling gasoline with an unhealthy benzene content. See also Delran Ed. Ass'n. v. Bd. of Edue., 277 N.J.Super. 538, 543-44, 650 A.2d 7 (App. Div.1994) (suggesting that retaliation against teacher for refusing to obey school superintendent's order to give confidential pupil records to independent contractor would violate CEPA); Parker v. M & T Chemicals, Inc., 236 N.J.Super. 451, 460, 566 A.2d 215 (App. Div.1989) *1062 (holding that retaliation against in-house attorney "for refusing to join a scheme to cheat a competitor" is covered under CEPA).
Employers, of course, act through their employees. But not every employee action connected with the employment is chargeable to the employer under CEPA. We conclude that Roach did not disclose to Briggs or to the TRW hotline any activity of his employer TRW. Consequently, section 3a of CEPA is not applicable.
Roach's disclosures were threefold: (1) DeBord's alleged cheating on his expense account regarding a $15.00 lunch; (2) De-Bord's approval of a $4,000 lease of computer equipment from a firm in which he or his son allegedly had an interest; and (3) the alleged interest of Vrungos and DeBord in TRW's acquisition of Nations, an acquisition which never occurred. None of these activities attributed to DeBord or Vrungos constitutes an activity of TRW. These activities were not remotely on TRW's behalf and did not advance TRW's interests. To the contrary, if Roach's allegations were true, TRW was the victim.
We are persuaded that the Legislature in enacting CEPA did not intend that the disclosure of employee activities victimizing the employer would fall within CEPA. See Littman v. Firestone Tire & Rubber Co., 715 F.Supp. 90 (S.D.N.Y.1989) (holding that plaintiff's allegation that he was fired because he disclosed fraudulent activity by co-employee was not covered by New Jersey's CEPA because the employer was the sole victim of the alleged fraud; indirect impact on shareholders does not bring case within CEPA). CEPA's definition of "employer" supports our conclusion. It provides in relevant part that "`Employer' means any individual ... or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent." N.J.S.A. 34:19-2a. [Emphasis added.] We are persuaded that an employee's activities in conflict solely with the employer's interests cannot constitute an activity, policy or practice of the employer within the meaning of section 3a.
Our conclusion is also consistent with common law principles of respondeat superior which imposes liability on an employer for a tort of an employee acting within the scope of his or her employment. To be within the scope of employment, the employee's behavior must be "`actuated, at least in part, by a purpose to serve the master.'" Di Cosala v. Kay, 91 N.J. 159, 169, 450 A.2d 508 (1982) (quoting Restatement (Second) of Agency § 228 (1957)); see also Abbamont, supra, 138 N.J. at 416, 650 A.2d 958.
CEPA's objective is the protection of the public interest by encouraging the disclosure of employer activities potentially harmful to that interest. The alleged activities Roach disclosed do not further CEPA's objective. Compare Regan v. City of New Brunswick, 305 N.J.Super. 342, 355-56, 702 A.2d 523 (App.Div.1997) (officer's reasonable belief that another officer charged an innocent person with assault is within CEPA's protection) with Kaman v. Montague Township, 306 N.J.Super. 291, 301-02, 703 A.2d 680 (App.Div.1997) (CEPA does not apply to termination allegedly based on terminated employee's instructions to her secretary not to take messages for another secretary).
Two circuits of the United States Court of Appeals applied, in the context of retaliatory discharge, the distinction between disclosure of employee behavior versus employer behavior. Little v. United Technologies, Carrier Transicold Division, 103 F.3d 956 (11th Cir.1997), involved a claim under 42 U.S.C.A. § 2000e-3(a) that defendant employer had retaliated against plaintiff because plaintiff had "opposed ... an unlawful employment practice." Ibid. Plaintiff, a white male, had complained about racially derogatory remarks made by Wilmot, a white co-employee. In affirming a summary judgment for defendant, the Court of Appeals held that Wilmot's discriminatory remarks were not an "unlawful employment practice" because his remarks were not attributable to the employer. Id. at 959-60.
Silver v. KCA, Inc., 586 F.2d 138 (9th Cir.1978) reached the same conclusion as Little on similar facts. There, the court stated:

*1063 By the terms of the statute, however, not every act by an employee in opposition to racial discrimination is protected. The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual.
[Id. at 141.]
Plaintiff relies on Higgins v. Pascack Valley Hospital, 307 N.J.Super. 277, 704 A.2d 988 (App.Div.1998), certif. granted, 156 N.J. 405, 719 A.2d 637 (1998)[2], in support of his argument that disclosure of unlawful activities of non-supervisory employees could be the predicate of a section 3a CEPA claim. We are persuaded that Higgins is inapposite. There, it was held that the employer could be liable under CEPA for retaliatory conduct if the employer through its supervisor had condoned or ratified an employee's alleged illegal activity. Higgins, however, involved allegations that plaintiff's co-employee had falsified hospital records and had stolen a patient's drugs. Thus, the public was victimized. In the present case, TRW, the employer, was the only victim.
Plaintiff also relies on an unpublished opinion of the United States District Court, District of New Jersey in Asen v. Cooper Hospital, No. 95-869, 1996 WL 347451 (D.N.J. June 7, 1996). Although plaintiff may have violated R. 1:36-3 by citing an unpublished opinion, we mention the case because it illustrates our point. There, plaintiff alleged that she was terminated because she disclosed that the hospital's Department of Psychiatry was double billing by charging the client and the client's insurer, billing for services not rendered and falsifying dates and statistics. Thus, in Asen the disclosed activities were performed in behalf of the employer, though misguidedly so, and victimized third parties.
The jury also found that TRW had violated section 3c(1), because Roach had objected to "illegal and unethical activities." We question whether this section applies because there were no ongoing activities to object to. Plaintiff's disclosures about Vrungos and De-Bord were historical. More importantly, our analysis regarding section 3a applies to 3c(1). The "activity policy or practice," section 3c(1), must be that of the employer. The alleged activities of Vrungos and DeBord do not qualify.
Plaintiff's reliance on the fact that TRW is a major defense contractor is without merit. The evidence would not support a finding that the activities Roach disclosed had an actionable impact on the United States or any other TRW customer.
TRW also contends that Roach did not establish that TRW terminated him in retaliation for his disclosures. Although we have reservations about the sufficiency of the proof in this regard, we need not address the issue in light of our determination that CEPA does not apply to Roach's disclosures. For this reason, we need not address TRW's contention that the evidence did not support a conclusion that Roach had an objectively reasonable belief that unlawful acts had occurred.
The judgment is reversed.
NOTES
[1] Section III is prepared by the employee being evaluated.
[2] The appeal has been argued, but the Supreme Court has not yet issued an opinion.