754 A.2d 544

ESTATE OF FRANK L. ROACH, PLAINTIFF–APPELLANT, AND KATHERINE BORAL, PLAINTIFF, v. TRW, INC., DEFENDANT–RESPONDENT, AND FRANCES KRUSE, INDIVIDUALLY AND AS AGENT FOR TRW, INC., DEFENDANT.

Argued May 2, 2000—Decided July 19, 2000.

600

*Linda B. Kenney*, argued the cause for appellant (*Kenney Schaer & Martin*, attorneys; *Ms. Kenney* and *Gregory S. Schaer*, of counsel; *Mr. Schaer*, on the briefs).

*Kenneth J. Kelly*, argued the cause for respondent (*Epstein Becker & Green, Mr. Kelly* and *Mark D. Lurie*, on the brief).

*Christopher P. Lenzo*, submitted a brief on behalf of *amicus curiae*, National Employment Lawyers Association of New Jersey (*Francis, Lenzo & Manshel*, attorneys).

The opinion of the Court was delivered by

VERNIERO, J.

This appeal requires us to consider whether the jury's verdict in favor of plaintiff is sustainable under the Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 to –8 (CEPA). The Appellate Division set aside the verdict based on its conclusion that plaintiff did not articulate, as purportedly required by CEPA, that the

actions of his co-employees, about which he complained, implicated the public interest. Because we differ in our interpretation of the statute and conclude that the jury's verdict is sustainable on the record presented, we reverse.

I.

Frank Roach, a decorated military veteran, began his employment with TRW, Inc. in 1981. (In this opinion, we refer to Roach as "plaintiff" because he appeared in that posture in the original litigation. Plaintiff is now deceased and his estate has replaced him in this appeal.) For seventeen years prior to that employment, plaintiff had been an Army intelligence officer. He was hired by TRW as the Staff Assistant of Physical Security, to protect TRW's secrets, including classified information provided to TRW by the United States government. Plaintiff was twice promoted in the security division and received positive evaluations.

As a defense contractor, TRW was directed by the United States to implement an ethics program for the training and education of its employees. That program required TRW to promulgate a company code of conduct. In 1987, TRW named plaintiff the Assistant Manager of the Business Ethics and Conduct Program; he was promoted to manager in 1988. As the manager of TRW's ethics program, plaintiff was substantially involved in implementing the code of conduct.

The code of conduct provides:

It is the policy of [TRW] to comply fully with all laws governing its operations and to conduct its affairs according to the highest legal and ethical standards.

Compliance with this policy means not only observing the law, but so conducting [TRW] business that [TRW] will deserve and receive recognition as an ethical and law-abiding enterprise, alert to all the responsibilities of good corporate citizenship. It should be understood that the spirit of this policy requires that [TRW] maintain a high degree of integrity in all of its interactions with shareholders, employees, customers, suppliers, local communities, governments at all levels and the general public.

. . . .

An infraction by any employee of this policy, of the applicable laws or of recognized ethical business standards will subject the employee to disciplinary action, which may include warning, reprimand, probation, reduction in compensation, demotion, suspension or dismissal.

In defining the responsibilities of TRW employees, the code provides, in part, that "[e]very employee should bring possible violations of [the code] to the attention of (i) his or her supervisor or another [TRW] executive and (ii) a [TRW] attorney." More specifically, the code requires that "[a]ny employee who acquires information that gives such employee reason to believe that another employee is engaged in conduct prohibited by this policy" has a responsibility to report promptly such information to his or her supervisor or a TRW attorney. To facilitate reporting of violations, TRW set up an independent hotline managed by TRW attorneys. As stated in TRW's literature, the hotline was intended to provide employees with the mechanism to "satisfy[ ] their reporting obligations...." Failure to report a violation of the policy could result in disciplinary action, including termination.

In a section titled "Contracting with the United States Government," the code indicates that "[b]ecause even the appearance of impropriety can erode the public confidence in [TRW] and in the Government procurement process, this policy affirms required standards of conduct and practices with respect to transactions with the United States Government." The code further explains:

The standards of conduct covered by this policy explicitly require that scrupulous attention be given to ... proper recording and charging of all costs to the appropriate account, regardless of the status of the budget for that account. The falsification of timecards, charging unsupportable indirect costs, incorrect classification of costs, improper shifting of costs between contracts or other intentional allocation of costs to a Government contract contrary to the contract provisions or related laws, rules and regulations are [also] prohibited by this policy.

In another section, the code prohibits conflicts of interest, stating: "As a condition of employment, ... employees are required to avoid any situation that does or may involve a conflict of interest between their personal interests or the interests of the company." A conflict of interest is defined as "an activity, interest, or relationship that affects or appears to affect the objectivity,

judgment, or effectiveness of an employee in performing his/her job."

In June 1990, although he did not have a marketing background, plaintiff requested a transfer to a marketing position, District Office Manager, in TRW's Electronic Systems Group. Plaintiff was interviewed by seven people including his future supervisor, Charles Briggs. Another interviewer, Jim Vrungos, indicated that plaintiff was not qualified for the position. Nevertheless, plaintiff was hired for that position in the Fort Monmouth office. Vernon DeBord worked in that office, under the supervision of Vrungos.

In his new position, plaintiff was involved in acquiring and maintaining a contract with the Army worth approximately $65,000,000 over five years. He also was responsible for acquiring new business. Plaintiff received generally favorable performance reviews, although his evaluations contained some constructive criticisms from Briggs, who by that time was plaintiff's supervisor.

DeBord's secretary, Frances Kruse, approached plaintiff in November 1991 and alleged improper activities on the part of DeBord and Vrungos. (Apparently, DeBord had previously mentioned to plaintiff that he wanted to discharge Kruse.) The alleged activities included DeBord's filing of a false expense report seeking reimbursement for a minor lunch expense, and false time cards; DeBord's failure to disclose conflicts of interest with subcontractors; leasing equipment on behalf of TRW for DeBord's personal use; and failing to disclose a conflict of interest with a company that TRW considered acquiring, including allegations of kick-back payments intended for DeBord and Vrungos if the acquisition took place. Plaintiff investigated the matters, concluding that each complaint was valid. (In summarizing the complaints against DeBord and Vrungos, we make no judgment regarding their validity and imply no wrongdoing on anyone's part.) Importantly, plaintiff testified that he reasonably believed that, by their actions, DeBord and Vrungos had violated TRW's code of conduct and were engaged in illegal and unethical conduct.

Plaintiff reported his findings to Briggs who, according to plaintiff, indicated that he would "follow-up." Plaintiff believed that in following up Briggs would call the hotline and report the matter to TRW attorneys, but, instead, Briggs told Vrungos about plaintiff's complaints. According to plaintiff, Briggs and Vrungos informed plaintiff during a conference call that the allegations were not important enough to warrant further investigation and that the allegations were "gray" in nature.

On November 22, 1991, plaintiff met with Briggs in Washington, D.C. Plaintiff stated to Briggs that the two of them should submit plaintiff's findings to the legal department to comply with their reporting obligations under the code of conduct. According to plaintiff, Briggs responded that Vrungos was not "happy" with plaintiff and that plaintiff was not a "team player." Plaintiff asked Briggs to acknowledge in writing that he (plaintiff) had satisfied his reporting obligations. Plaintiff never received such acknowledgment. Later that week, Vrungos went to the Fort Monmouth office and had a "heated" meeting with plaintiff. Purportedly, Vrungos called plaintiff a liar and informed plaintiff that Briggs owed Vrungos a favor, the inference being that Briggs would overlook plaintiff's complaints.

Plaintiff testified that his relationship with Briggs then deteriorated and that their communications significantly decreased. Plaintiff claimed that the work environment at the Fort Monmouth office became hostile. Additionally, plaintiff stated that he was informed that no action would be taken against DeBord because he (DeBord) was slated to retire in two years.

On March 19, 1992, plaintiff himself called the TRW hotline, believing the call was necessary to satisfy his reporting obligations under the code. During his conversation, plaintiff indicated that he feared he might be subject to termination in the future. That plaintiff's call to the hotline "fell through the cracks" is undisputed by the hotline attorneys; the attorneys apparently took no action on plaintiff's complaints.

On August 6, 1992, TRW announced in its company newsletter that the space and defense sectors of TRW would be reorganized effective January 1, 1993. Plaintiff's group, Electronic Systems Group, was to be combined with the Space and Technology Group. Frederick Brown, a TRW executive, was assigned to head the new division. On October 12, 1992, Brown asked nine individuals, including Briggs, to evaluate each staff member for past and expected future performance.

Briggs and another TRW employee, David DiCarlo, evaluated plaintiff. Unlike Briggs who had substantial interaction with plaintiff, DiCarlo had little such involvement. Briggs gave plaintiff a rating of "3" with expected acceptable performance; DiCarlo gave plaintiff a "4" with expected "inability to meet the challenges of the future." Plaintiff's average score was a 3.5, meaning plaintiff was an "average performer."

TRW sent plaintiff a layoff notice on November 3, 1992, providing plaintiff with ten-weeks notice to find new employment. Plaintiff stated that he was surprised by the notice because he had received an organization chart two days earlier that listed him as the District Office Manager for Fort Monmouth. According to trial testimony, plaintiff called Brown to ask about the layoff decision and Brown responded that the Fort Monmouth office was to be closed pursuant to a recommendation by Briggs. Plaintiff then called Briggs who purportedly denied knowledge of the layoff notice and denied making a recommendation to close the office. At trial, Brown testified that TRW employees continued to work at the Fort Monmouth office.

Plaintiff filed a formal grievance with TRW and met with company officials to protest his layoff. According to plaintiff's notes about the meeting, TRW's vice president, Jay McCann, found no evidence that plaintiff was terminated because of his various complaints. The record indicates that plaintiff was ranked thirty-seven out of thirty-seven individuals evaluated in connection with the consolidation of the divisions. However, the record also reveals that the other thirty-six employees were either retained or

transferred to other positions, had voluntarily resigned, or were hired back as independent contractors for TRW.

On November 30, 1993, plaintiff filed a complaint in the Law Division against TRW, alleging violations of CEPA, breach of contract, breach of the implied covenant of good faith and fair dealing, negligent infliction of emotional distress, and a common-law violation of public policy. On April 17, 1997, the Law Division partially granted TRW's motion for summary judgment, dismissing all of plaintiff's claims except for his CEPA claim.

At trial, plaintiff presented evidence to prove that TRW's decision to terminate his employment was motivated, in part, by plaintiff's complaints about his co-employees in violation of numerous CEPA provisions. Specifically, plaintiff asserted that he reasonably believed that he had disclosed activities that were unlawful pursuant to *N.J.S.A.* 34:19–3a. ("section 3a.") and *N.J.S.A.* 34:19–3c.(1) ("section 3c.(1)"), were fraudulent or criminal pursuant to *N.J.S.A.* 34:19–3c.(2) ("section 3c.(2)"), or were incompatible with public policy pursuant to *N.J.S.A.* 34:19–3c.(3) ("section 3c.(3)"). The jury found for plaintiff under sections 3c.(1) and 3c.(2), but not under section 3c.(3). The jury also found for plaintiff under section 3a. Accordingly, the jury awarded plaintiff $629,800 in lost wages and $75,000 for pain, suffering, and emotional distress. TRW moved for judgment notwithstanding the verdict, or in the alternative, for a new trial. The trial court denied TRW's motion.

The Appellate Division set aside the jury's verdict, concluding that CEPA did not extend protection to employees' complaints about co-employees' actions that harmed only the employer. *Roach v. TRW, Inc.,* 320 *N.J.Super.* 558, 570–71, 727 *A.*2d 1055 (App.Div.1999) (*Roach I* ). We granted plaintiff's petition for certification, 162 *N.J.* 195, 743 *A.*2d 847 (1999), but summarily remanded to the Appellate Division to reconsider the appeal in view of our decision in *Higgins v. Pascack Valley Hospital,* 158 *N.J.* 404, 730 *A.*2d 327 (1999) (finding that certain complaints

about co-employee activity are protected under CEPA section 3c.(3)).

The Appellate Division affirmed its earlier decision in *Roach I.* The court concluded that *Higgins* was inapplicable because plaintiff's complaints did not "implicate the public interest," and, therefore, CEPA did not apply to plaintiff's case. 326 *N.J.Super.* 493, 742 *A.*2d 135 (App.Div.1999) (*Roach II*). We again granted certification, 163 *N.J.* 78, 747 *A.*2d 286 (2000), and also granted the National Employment Lawyers Association of New Jersey's motion to appear as *amicus curiae.*

## II.

As noted, the jury concluded that plaintiff's discharge ran contrary to CEPA sections 3a., 3c.(1), and 3c.(2), but was not a violation of section 3c.(3). In so doing, the jury specifically determined that plaintiff had an objectively reasonable basis to believe that TRW had engaged in unlawful conduct pursuant to section 3a., that plaintiff had objected to co-employee activity that he reasonably believed was in violation of a law, rule or regulation pursuant to section 3c.(1), and was fraudulent or criminal pursuant to section 3c.(2). The jury also determined that the alleged co-employee activity was *not* incompatible with a clear mandate of public policy concerning the public welfare pursuant to section 3c.(3). Those determinations are separately reflected on the jury's verdict sheet.

In overturning the verdict, the Appellate Division noted that "the jury made a specific finding under [section 3c.(3) ] that the activities Roach had disclosed were not incompatible with a clear mandate of public policy." *Roach II, supra,* 326 *N.J.Super.* at 497, 742 *A.*2d 135 (citation and internal quotation marks omitted). In essence, the Appellate Division held that all CEPA violations require a specific showing that the complained-about activities implicate the public interest. Citing in part to the jury's finding pursuant to section 3c.(3), the court concluded that the entire

verdict had to be set aside. TRW urges the same statutory construction and result.

We disagree. The relevant sections of *N.J.S.A.* 34:19–3 provide:

An employer shall not take any retaliatory action against an employee because the employee does any of the following:

a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer ... that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law ...;

....

c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law or ...;

(2) is fraudulent or criminal; *or*

(3) is incompatible with *a clear mandate of public policy* concerning the public health, safety or welfare or protection of the environment.

[Emphasis added.]

By the statute's plain language, the Legislature has explicitly provided under section 3c.(3) that an employee shall not be subject to retaliatory action when he or she objects to any activity that the employee "reasonably believes ... is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment." That language is unique to section 3c.(3).

TRW cites this Court's decision in *Mehlman v. Mobil Oil Corp.,* 153 *N.J.* 163, 707 *A.*2d 1000 (1998), for the proposition that employees must specifically prove that their complaints involve a matter of public interest. Defendant's reliance on *Mehlman* is misplaced. In that case, we specifically considered whether a plaintiff must know the exact source of public policy when asserting a CEPA claim under section 3c.(3). Because *Mehlman* pertained solely to a complaint brought under section 3c.(3), our holding in that case does not import the requirements of that section to other parts of CEPA.

As we have noted in other settings, CEPA is designed to protect employees who blow the whistle on illegal or unethical

activity committed by their employers or co-employees. *Higgins, supra,* 158 *N.J.* at 417, 730 *A.*2d 327; *Barratt v. Cushman & Wakefield,* 144 *N.J.* 120, 127, 675 *A.*2d 1094 (1996). "The purpose of CEPA is to protect employees who report illegal or unethical work-place activities. So viewed, CEPA is remedial legislation. Consequently, courts should construe CEPA liberally to achieve its remedial purpose." *Barratt, supra,* 144 *N.J.* at 127, 675 *A.*2d 1094. Stated differently, CEPA is supposed to encourage, not thwart, legitimate employee complaints. Consistent with CEPA's broad remedial purpose, we are satisfied that the Legislature did not intend to hamstring conscientious employees by requiring that they prove in all cases that their complaints involve violations of a defined public policy.

Needless to say, all laws and regulations are imbued with the public interest. We also acknowledge that prior to CEPA this Court recognized that employees at common law would be protected from "wrongful discharge when the discharge is contrary to a clear mandate of public policy." *Pierce v. Ortho Pharm. Corp.,* 84 *N.J.* 58, 72, 417 *A.*2d 505 (1980); *see also Mehlman, supra,* 153 *N.J.* at 180–87, 707 *A.*2d 1000 (tracing CEPA's common-law roots and surveying applicable case law). Further, we recently observed that CEPA's "overriding policy . . . is to protect society at large." *Cedeno v. Montclair State Univ.,* 163 *N.J.* 473, 478, 750 *A.*2d 73 (2000).

Those acknowledgments and observations are consistent with our analysis. The overall objective of CEPA is to protect society by shielding employees who expose illegal or deleterious activities at the workplace. The Legislature has attempted to accomplish that goal by designing a statutory scheme that protects employees who complain about activities that fall into three basic categories: activities that the employee reasonably believes are in violation of some specific statute or regulation (sections 3a. and 3c.(1)), are fraudulent or criminal (section 3c.(2)), or are incompatible with policies concerning the public health, safety or welfare or the protection of the environment (section 3c.(3)).

That latter category evidences a legislative recognition that certain forms of conduct might be harmful to the public although technically not a violation of a specific statute or regulation. We find no indication in the legislative history that section 3c.(3) was enacted for any other purpose but to encourage conscientious employees to disclose or object to activities encapsulated in that section. Thus, we would pervert the legislative intent if we required employees to prove the section 3c.(3) elements, or to establish some other violation of "public policy," when asserting claims under the other sections of the statute. Moreover, by requiring aggrieved employees to reasonably believe that a violation of the civil or criminal law has occurred when asserting complaints under CEPA sections 3a., 3c.(1) and 3c.(2), the Legislature has already accommodated the public interest in those provisions of the statute. We see no reason, then, to mandate additional proofs in the case here.

### III.

Having concluded that the jury's finding in respect of section 3c.(3) does not bar plaintiff's recovery under sections 3a., 3c.(1), and 3c.(2), we must now determine whether the jury's verdict concerning those other CEPA sections is sustainable on the present record. We must also determine whether there was a sufficient basis for the jury to find a causal connection between plaintiff's complaints and his eventual discharge.

In that regard, TRW asserts that the trial court should have granted its motion for judgment notwithstanding the verdict because plaintiff failed to demonstrate "a causal connection between the reports of wrongful activity by the employee and the allegedly retaliatory termination of employment." TRW contends that there is no persuasive evidence that plaintiff was laid off due to complaints he made more than a year before the discharge. In addition, TRW argues that plaintiff's case should fail because Brown, not Briggs, made the decision to terminate plaintiff. As support, TRW asserts that Brown, one of defendant's most senior

executives, did not even know about plaintiff's complaints when he (Brown) made a legitimate business decision not to have his division represented at the Fort Monmouth office.

 Although TRW makes a legitimate argument, the jury's verdict is entitled to great deference. Examining whether a retaliatory motive existed, jurors may infer a causal connection based on the surrounding circumstances. *Romano v. Brown & Williamson Tobacco Corp.*, 284 *N.J.Super.* 543, 550, 665 *A.2d* 1139 (App.Div.1995). When considering a motion for judgment notwithstanding the verdict, we apply the following standard of review:

> "[I]f, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied...."
>
> [*Sons of Thunder, Inc. v. Borden, Inc.*, 148 *N.J.* 396, 415, 690 *A.2d* 575 (1997) (quoting *Dolson v. Anastasia*, 55 *N.J.* 2, 5–6, 258 *A.2d* 706 (1969) (citations and quotations omitted)).]

"[T]hat standard ensures that appellate tribunals will not overstep their bounds by usurping the jury's task of assessing the credibility of the witnesses." *Ibid.* Accordingly, we will disturb a jury's verdict "only if we find that the jury could not have reasonably used the evidence to reach its verdict." *Ibid.*

 Based on those standards, we are satisfied that the jury could have reasonably concluded that the layoff decision was motivated by plaintiff's allegations concerning his co-employees' conduct. In arriving at that conclusion, the jury could have inferred from the evidence that in deciding to terminate plaintiff, Brown relied on a "tainted" evaluation prepared by Briggs. Jurors also could have taken into account the fact that the Fort Monmouth office remained open and that other employees slated for possible dismissal were transferred or received a different job at TRW, were hired back as independent contractors, or voluntarily resigned.

 Similarly, we find that the record adequately supports the jury's verdict in respect of CEPA sections 3c.(1) and 3c.(2).

With regard to section 3c.(1), CEPA does not require that the activity complained of (in this case, the alleged violations of TRW's code of conduct) be an actual violation of a law or regulation, only that the employee "reasonably believes" that to be the case. The same holds true in respect of section 3c.(2): the statute affords protection to employees if they reasonably believe that the activity complained of is "fraudulent or criminal" even when the activity does not rise to the level of an actual crime. *Mehlman, supra,* 153 *N.J.* at 193–94, 707 *A.*2d 1000 ("The object of CEPA is not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to . . . conduct that they reasonably believe to be unlawful or indisputably dangerous to the public health, safety or welfare.").

We are thus persuaded that the numerous improprieties alleged against plaintiff's co-employees could form the basis of a reasonable belief that unlawful conduct had occurred within the meaning of CEPA. During the period relevant to this action, TRW occupied a sensitive position as a federal defense contractor. In recognition of that position, TRW's code of conduct stressed the importance of the highest ethical conduct on the part of its employees. Based on that code's requirement of strict compliance, plaintiff reasonably could have believed that the allegations against DeBord and Vrungos rose to the level of significant improprieties consistent with CEPA sections 3c.(1) and 3c.(2).

Although the term "reasonably believes" in sections 3c.(1) and 3c.(2) provides ample justification to sustain the jury's verdict in the present case, we caution that in future cases that language may prove fatal to an employee's claim. For instance, if an employee were to complain about a co-employee who takes an extended lunch break or makes a personal telephone call to a spouse or friend, we would be hard pressed to conclude that the complaining employee could have "reasonably believed" that such minor infractions represented unlawful conduct as contemplated by CEPA. CEPA is intended to protect those employees whose disclosures fall sensibly within the statute; it is not intended to

spawn litigation concerning the most trivial or benign employee complaints.

Lastly, plaintiff's supervisor was made aware of the co-employees' alleged improper conduct and, rather than conduct an independent investigation, the supervisor discussed the matter with one of the subjects of the complaint and essentially dismissed the allegations. Similarly, the hotline attorneys did not respond or even look into plaintiff's allegations that co-employees were engaging in fraudulent behavior, possibly arranging kickbacks, and padding accounts. Based on those facts, the jury had a basis to find that the employer had ratified the alleged employee conduct, thereby treating the complained-about activities as the employer's own conduct in satisfaction of CEPA section 3a. *See Johnson v. Hospital Serv. Plan of N.J.*, 25 *N.J.* 134, 141, 135 *A.2d* 483 (1957) (observing that "[t]he intent to ratify an unauthorized transaction may be inferred from a failure to repudiate it").

Although we might not share the jury's conclusion that the employer's inaction alone amounted to ratification, we are unwilling to substitute our judgment for that of the trier of fact. *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.*, 65 *N.J.* 474, 484, 323 *A.2d* 495 (1974). Moreover, even if we assume that the co-employees' alleged conduct did not implicate the company itself, the jury's findings in respect of sections 3c.(1) and 3c.(2) are sufficient to sustain the entire verdict. "[I]f there are numerous theories upon which the jury could have rested its determination, the verdict of the jury must be upheld if there is any one possible theory of liability ... substantiated by the evidence taken as a whole...." *Sons of Thunder v. Borden*, 285 *N.J.Super.* 27, 77, 666 *A.2d* 549 (App.Div.1995) (Humphreys, J.A.D., dissenting) (citation and internal quotation marks omitted), *rev'd*, 148 *N.J.* 396, 690 *A.2d* 575 (1997).

## IV.

We hold that plaintiff was not required to prove a defined public-policy violation to win a jury verdict under CEPA sections

3a., 3c.(1), and 3c.(2). We further hold that plaintiff provided sufficient proofs to the jury that his complaints to his employer were protected under CEPA and that his discharge was motivated by those complaints. Thus, we will not disturb the jury's findings. Accordingly, we reverse the judgment of the Appellate Division and remand to the Law Division to reinstate the jury's verdict.

*For reversal and remandment*—Chief Justice PORITZ and Justices O'HERN, STEIN, COLEMAN, LONG, VERNIERO and LaVECCHIA—7.

*Opposed*—None.