903 A.2d 1055

ANGELO J. MAIMONE, PLAINTIFF–RESPONDENT, v. THE CITY OF ATLANTIC CITY, THE ATLANTIC CITY POLICE DEPARTMENT AND ARTHUR C. SNELLBAKER, DEFENDANTS–APPELLANTS.

Argued March 6, 2006—Decided July 20, 2006.

222

*Eric J. Riso* argued the cause for appellants (*Zeller & Bryant,* attorneys).

*Caren Litvin* argued the cause for respondent.

Judge SKILLMAN (temporarily assigned) delivered the opinion of the Court.

This appeal involves a claim under the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8, by a police officer who alleges he was transferred from detective to patrolman in retaliation for his objections to the Chief of Police's decision to terminate enforcement of provisions of the Code of Criminal Justice prohibiting promotion of prostitution and restricting the location of sexually-oriented businesses.

I

Plaintiff Angelo Maimone has been a member of the Atlantic City Police Department since 1988. He was transferred in 1991 from a patrolman position to detective in the Special Investigations Unit. As a result, plaintiff became contractually entitled after one year to receive an additional 3% of his base salary. Beginning

in 1993, plaintiff was assigned to conduct investigations of prostitution and other sexually-related offenses, which he continued to do until early 2001.

In May 2000, defendant Arthur C. Snellbaker was appointed Chief of the Atlantic City Police Department. According to plaintiff, around eight months after Snellbaker's appointment, Captain William Glass told him at a staff meeting that he could not initiate any new promotion of prostitution investigations unless they "directly impacted the citizens of Atlantic City." Shortly thereafter, plaintiff's immediate supervisor, Sergeant Glenn Abrams, directed him to terminate all pending investigations into the promotion of prostitution and to conduct only narcotics investigations. Plaintiff alleges that Abrams told him that "they," referring to prostitution investigations, "don't exist." Plaintiff, who at that point was the only detective still actively involved in promotion of prostitution investigations, understood this directive to apply not only to him but also to all other officers in the Special Investigations Unit.

Around the same time Abrams gave plaintiff this directive, the files plaintiff had maintained regarding persons involved in the promotion of prostitution were removed from a filing cabinet under his control, and thereafter, plaintiff's access to those files was restricted. When plaintiff complained to Abrams about his loss of access to these files, Abrams allegedly told him: "You're never going to see the files again."

On April 6, 2001, plaintiff sent a memorandum to Sergeant Abrams regarding his inability to gain access to those files, which stated in part:

Late this past year I was advised that Sgt. Coholan of the Chiefs of Police Office seized a filing cabinet from the Special Investigations Office. This filing cabinet contained numerical prostitute background files in two drawers. The other two drawers contained Escort Service/Massage Service as well as pimp intelligence files. (Many of these files contain sensitive material.)

I was advised that if I needed to see these files, the new procedure was that I was to report during the day to the Chiefs Office. I was to log in and out of a secure file room, which I complied with. I was then advised that the files were moved again and only told the lawyers had them.

. . . .

As part of my duties I routinely update files on Escort and Massage services working in Atlantic City. I noted at least seven new services operating this month alone. I have no file space for these new files nor do I have any means of cross-referencing these files against current files without access to them. . . .

I am respectfully requesting this report be forwarded to Chief Arthur C. Snellbaker, for a response. I am requesting instructions as to if I am to continue gathering such files or am I to cease such activities.

According to plaintiff, after Abrams read this memorandum, he shook his head and said to plaintiff: "You're asking for it."

In 2001, Maimone also complained about Atlantic City's failure to enforce *N.J.S.A.* 2C:34–7, which makes it a fourth-degree offense for a sexually-oriented business to operate within 1,000 feet of a church or school.[1] After the county prosecutor decided that *N.J.S.A.* 2C:34–7 should be enforced by the revocation of the mercantile licenses of offenders rather than by criminal prosecution, plaintiff wrote letters to the municipal solicitor requesting the initiation of proceedings to revoke the licenses of sexually-oriented businesses that were operating in violation of this prohibition. When the city solicitor failed to take any action, plaintiff sent a memorandum to Abrams, dated May 26, 2001, which stated in part:

I am respectfully asking, that this Office request that the mercantile license of AC News and Video be revoked, due to the fact that this location is clearly in violation of 2C:34–7. This location is clearly a detriment to the neighborhood. There is a Covenant House for juveniles on the same block as well as an elementary school and Synagogue being nearby. As you are aware, it has been and continues to be

---

[1] The relevant part of *N.J.S.A.* 2C:34–7 provides:

[N]o person shall operate a sexually oriented business within 1,000 feet of any existing sexually oriented business, or any church, synagogue, temple or other place of public worship, or any elementary or secondary school or any school bus stop, or any municipal or county playground or place of public resort and recreation, or any hospital or any child care center, or within 1,000 feet of any area zoned for residential use.

Because plaintiff's specific complaint was that a particular sexually-oriented business was being allowed to operate within 1,000 feet of a school and synagogue, and for ease of reference, the prohibition contained in *N.J.S.A.* 2C:34–7 is referred to in this opinion as a prohibition against sexually-oriented businesses being operated within 1,000 feet of a school or church.

the practice of the Atlantic County Prosecutor's Office, not to prosecute this statute. It is their contention that civil remedies (IE: Removal of Mercantile license) would be sufficient and thus relieving the Prosecutors Office from utilizing their limited resources in prosecution.

If the city chooses not to enforce this statute in this matter, all future prosecutions will be jeopardized.

Within days after he sent this memorandum, Captain Glass said to plaintiff: "You're out of here, you're going to patrol." Effective June 10, 2001, plaintiff was transferred from his detective position in the Special Investigations Unit to patrol officer. Plaintiff was told that the reason for his transfer was an April 17, 2001 newspaper story that disclosed he had attended the wedding of a daughter of a suspected organized crime figure.

## II

Plaintiff subsequently brought this CEPA action against Atlantic City and Chief Snellbaker.[2] After the completion of discovery, defendants moved for summary judgment. The trial court reviewed the motion under the analytical framework set forth in *Dzwonar v. McDevitt*, 177 *N.J.* 451, 462, 828 *A.*2d 893 (2003):

A plaintiff who brings a cause of action pursuant to *N.J.S.A.* 34:19–3c must demonstrate that: (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in *N.J.S.A.* 34:19–3c; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

The trial court concluded that plaintiff had presented sufficient evidence to support jury findings in his favor under the second, third and fourth tests set forth in *Dzwonar*. First, the court held that plaintiff's complaints to his superiors concerning their alleged policy decision not to enforce laws relating to promotion of prostitution and restrictions on the location of sexually-oriented busi-

---

[2] The complaint named both Atlantic City and the Atlantic City Police Department as defendants. The trial court dismissed the police department from the action on the ground it is not an "entity with the legal power to sue or be sued." Plaintiff does not challenge this dismissal.

nesses was a "whistle-blowing" activity. Second, the court held that plaintiff had made a sufficient showing that the 3% reduction in salary and other alleged adverse consequences of his transfer to patrol duty constituted an adverse employment action. Third, the court concluded that a rational trier of fact could find that plaintiff was transferred to patrol because of his whistle-blowing activity.

However, the court concluded that plaintiff had not presented evidence that could support a jury finding in his favor on the first *Dzwonar* test—that he "reasonably believed" Atlantic City's alleged decision to cease enforcing the provisions of the Code relating to promotion of prostitution and restricting the location of sexually-oriented businesses "violat[ed] . . . a clear mandate of public policy." *Ibid.* The court ruled that plaintiff's complaint about the municipality's failure to enforce these laws was simply a disagreement with a discretionary decision of supervisory police officials regarding the allocation of police personnel and resources. Consequently, the court concluded that plaintiff could not be found to have reasonably believed those discretionary policy decisions violated a clear mandate of public policy. Accordingly, the court granted defendants' motion for summary judgment.

The Appellate Division reversed in an unreported opinion. It concluded that the evidence, viewed in a light most favorable to plaintiff, could support a finding that he had an "objectively reasonable belief" that defendants had not simply reduced the police resources allocated to promotion of prostitution investigations, but had made a policy decision "to ignore violations of the prostitution laws within the City." The court also rejected defendants' argument that plaintiff's transfer from his detective position to patrol did not constitute an "adverse employment action."

We granted defendants' petition for certification, 185 *N.J.* 298, 884 *A.*2d 1267 (2005), and now affirm the Appellate Division.

### III

Plaintiff's CEPA claim is based on *N.J.S.A.* 34:19–3c, which provides:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> . . . .
>
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . .;
>
> (2) is fraudulent or criminal; or
>
> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

As previously noted, the Court held in *Dzwonar, supra,* 177 *N.J.* at 462, 828 *A.*2d 893, that a plaintiff who brings an action under this section must demonstrate that:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in *N.J.S.A.* 34:19–3c; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

These requirements must be liberally construed to effectuate CEPA's important social goals. *See Green v. Jersey City Bd. of Educ.,* 177 *N.J.* 434, 448, 828 *A.*2d 883 (2003).

Defendants do not dispute that plaintiffs' objections to Atlantic City's alleged policy decision to cease enforcement of the provisions of the Code that prohibit promotion of prostitution and restrict the location of sexually-oriented businesses constituted a "whistle-blowing" activity, thus satisfying the second requirement of a claim under *N.J.S.A.* 34:19–3c identified in *Dzwonar.* However, defendants argue that the evidence plaintiff presented in opposition to their motion for summary judgment was insufficient to establish the other three requirements of a claim under this section. We address those requirements in the order set forth in *Dzwonar.*

### A

Plaintiff rests his claim solely on subsection (3) of *N.J.S.A.* 34:19–3c. At the outset, it is appropriate to compare the elements of a claim under this subsection with a claim under c(1). While an

employee who proceeds under c(1) must show that he or she reasonably believed that the employer's activity, policy or practice "violat[ed]" a law, rule, or regulation, an employee who proceeds under c(3) is only required to show that the employer's activity, policy, or practice is "incompatible" with a clear mandate of public policy. To "violate" a law, a person must commit "[a]n infraction or breach of the law," *Black's Law Dictionary* 1564 (7th ed.1999), but a person's conduct may be found "incompatible" with a law based solely on a showing that the conduct is "irreconcilable" with that law, *id.* at 768. Moreover, since the recognized sources of public policy within the intent of c(3) include state laws, rules and regulations, *Mehlman v. Mobil Oil Corp.*, 153 *N.J.* 163, 188, 707 *A.*2d 1000 (1998), a plaintiff who pursues a CEPA claim under this subsection may rely upon the same laws, rules and regulations that may be the subject of a claim under c(1). *See Abbamont v. Piscataway Twp. Bd. of Educ.*, 138 *N.J.* 405, 424, 650 *A.*2d 958 (1994). Consequently, it is easier for an employee who proceeds under c(3) to prove that he or she reasonably believed the employer's conduct was "incompatible" with a clear mandate of public policy expressed in a law, rule or regulation than to show, as required by c(1), a reasonable belief that the employer's conduct "violated" a law, rule or regulation.

However, an employee who proceeds under c(3) must establish an additional element that is not required to prove a claim under c(1). Although an employee may pursue an action under c(1) based on objections to employer conduct that he or she reasonably believes violated any law, rule or regulation, an employee who proceeds under c(3) must make the additional showing that the "clear mandate of public policy" he or she reasonably believes the employer's policy to be incompatible with is one that "concern[s] the public health, safety or welfare or protection of the environment." *See Estate of Roach v. TRW, Inc.*, 164 *N.J.* 598, 609–11, 754 *A.*2d 544 (2000). This requirement is "unique" to c(3). *Id.* at 609, 754 *A.*2d 544.

The significance of this additional element of a claim under c(3) is illustrated by *Maw v. Advanced Clinical Commc'ns,* 179 *N.J.* 439, 846 *A.*2d 604 (2004), in which an employee brought a CEPA claim challenging her termination for refusing to execute an employment agreement containing what the employee believed to be an overly expansive do-not-compete clause. This Court concluded that case law which allows a no-compete provision only if it is reasonable does not constitute "a clear mandate of public policy" within the intent of c(3) because an employer's attempt to impose an unreasonable no-competition agreement impacts solely upon the individual employee and does not "implicate the public interest." *Maw, supra,* 179 *N.J.* at 445, 846 *A.*2d 604 (quoting *Maw v. Advanced Clinical Commc'ns,* 359 *N.J.Super.* 420, 446, 820 *A.*2d 105 (App.Div.2003) (Cuff, J.A.D., dissenting)); *see also Cosgrove v. Cranford Bd. of Educ.,* 356 *N.J.Super.* 518, 525, 813 *A.*2d 591 (App.Div.2003) (holding that retaliatory action against employee for complaining about alleged unfair allocation of overtime could not provide foundation for CEPA claim under c(3) because the employee's complaint "concern[ed] a personal harm rather than the public harm required under [this subsection]").

 Unlike in *Maw,* the provisions of the Code of Criminal Justice that prohibit promotion of prostitution and restrict the location of sexually-oriented businesses constitute "a clear mandate of public policy concerning the public health, safety or welfare[.]" The Code makes promotion of prostitution either a third or fourth-degree offense, depending on the circumstances, *see N.J.S.A.* 2C:34–1b(2) and *N.J.S.A.* 2C:34–1c(3), and it makes the operation of a sexually-oriented business within 1,000 feet of a school or church a fourth-degree offense, *N.J.S.A.* 2C:34–7. These provisions reflect a legislative recognition that the promotion of prostitution and other commercial sexual activities are a source of "venereal disease, ... profit and power for criminal groups who commonly combine it with illicit trade in drugs and liquor, illegal gambling and even robbery and extortion[,] ... [and] corrupt influence on government and law enforcement ma-

chinery." II *The New Jersey Penal Code, Final Report of the N.J. Criminal Law Revision Commission,* 301–02, cmt. 1 on *N.J.S.A.* 2C:34–2 (1971); *see also Hamilton Amusement Ctr. v. Verniero,* 156 *N.J.* 254, 273, 716 *A.*2d 1137 (1998) (noting that *N.J.S.A.* 2C:34–7 was designed to "mitigat[e] the adverse secondary effects of sexually oriented businesses to improve traffic safety, to limit harm to minors, and to reduce prostitution, crime, juvenile delinquency, deterioration in property values, and lethargy in neighborhood improvement efforts"), *cert. denied,* 527 *U.S.* 1021, 119 *S.Ct.* 2365, 144 *L.Ed.*2d 770 (1999).

█ To prevail on a CEPA claim under 3c(3), plaintiff is not required to show that defendants' alleged policy decision to cease enforcement of the provisions of the Code prohibiting the promotion of prostitution and restricting the location of sexually-oriented businesses actually violated or was incompatible with a statute, rule or other clear mandate of public policy. *See Dzwonar, supra,* 177 *N.J.* at 463–64, 828 *A.*2d 893. Plaintiff only has to show that he had an "objectively reasonable belief" in the existence of such a violation or incompatibility. *Id.* at 464, 828 *A.*2d 893. Plaintiff may carry this burden by demonstrating that "there is a substantial nexus between the complained-of conduct"—the cessation of investigations of promotion of prostitution and failure to enforce laws relating to the location of sexually-oriented businesses—and "[the] law or public policy identified by ... plaintiff"—in this case the provisions of the Code proscribing such criminal conduct. *Ibid.*

█ We conclude that plaintiff's proofs met this burden. Viewing the evidence in the light most favorable to plaintiff, as required on a motion for summary judgment, *see Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995), it could support a finding that he had an objectively reasonable belief that defendants made a policy decision to cease all investigation and enforcement of the Code provisions prohibiting the promotion of prostitution and restricting the location of sexually-oriented businesses. Plaintiff testified that Captain Glass told him

at a staff meeting in January 2001 not to initiate any new prostitution investigations unless they directly impacted the citizens of Atlantic City, and shortly thereafter, Sergeant Abrams issued a directive to terminate all pending promotion of prostitution investigations. Around the same time Sergeant Abrams issued this directive, the files plaintiff had maintained regarding persons involved in the promotion of prostitution were removed from a filing cabinet under his control, and thereafter, his access to those files was severely restricted. Since plaintiff was the only detective still actively involved in promotion of prostitution investigations at that time, he could reasonably have believed that the intent of Sergeant Abrams' directive and the removal of his investigation files was to terminate all such investigations in Atlantic City.

In addition, when plaintiff sent a memorandum requesting his superiors' assistance in persuading the municipal solicitor to initiate proceedings to revoke the mercantile licenses of sexually-oriented businesses operating in violation of *N.J.S.A.* 2C:34–7, the only response he received was Captain Glass' comment: "You're out of here, you're going to patrol." Plaintiff further testified that the City never took any action to revoke the licenses of sexually-oriented businesses that were operating in violation of *N.J.S.A.* 2C:34–7. Therefore, a trier of fact could find that plaintiff had an objectively reasonable belief that Atlantic City had made a policy decision not to enforce this statutory prohibition.

Under plaintiff's version of his superiors' statements and actions, the facts of this case are significantly different from *Schechter v. N.J. Dep't of Law & Pub. Safety,* 327 *N.J.Super.* 428, 743 *A.*2d 872 (App.Div.2000), which involved a CEPA claim by a Division of Gaming Enforcement supervisor who alleged that he was temporarily suspended and then demoted in retaliation for his objections to the Division's failure to act upon his recommendations for placement of names on a list of persons who are barred from casinos. *Id.* at 431, 743 *A.*2d 872. Schechter did not allege that the Division had terminated all investigations of potential

casino exclusion cases; he only alleged that the Division had failed to follow his recommendations regarding the filing of two petitions for exclusion of specific persons alleged to be involved in criminal activity and that the Division had made a policy decision "to assign a lower degree of priority to exclusion cases than in prior years[.]" *Id.* at 434, 743 *A.*2d 872. The Appellate Division concluded that such a policy decision could not be found to "violate any 'law, rule or regulation' or 'clear mandate of public policy,' as required to maintain a cause of action under CEPA." *Ibid.*

In contrast, plaintiff's claim is not simply that defendants decided to assign a "lower degree of priority" to investigations of violations of the Code provisions prohibiting promotion of prostitution and restricting the location of sexually-oriented businesses, but rather that they made a policy decision to terminate all enforcement of these criminal laws. Plaintiff was not told, and had no other reason to believe, that this alleged policy decision was due to budgetary constraints or an administrative determination that there was a need to assign additional officers to the investigation of more serious crimes. Therefore, a trier of fact could find that plaintiff had an objectively reasonable belief that defendants made a policy decision that was incompatible with a clear mandate of public policy concerning the public health, safety and welfare.

## B

We next consider defendants' argument that plaintiff failed to present sufficient evidence to support a jury finding that "an adverse employment action" was taken against him.

CEPA prohibits an employer from taking "retaliatory action" against an employee for protected conduct. *N.J.S.A.* 34:19–3. "Retaliatory action" is defined by CEPA to mean "the discharge, suspension or demotion of an employee, or *other adverse employment action* taken against an employee *in the terms and conditions of employment." N.J.S.A.* 34:19–2(e) (emphasis added). Under this definition, any reduction in an employee's

compensation is considered to be an "adverse ... action ... in the terms and conditions of employment." *See Beasley v. Passaic County,* 377 *N.J.Super.* 585, 608, 873 *A.*2d 673 (App.Div.2005). Moreover, even without any reduction in compensation, a withdrawal of benefits formerly provided to an employee may be found in some circumstances to constitute an adverse employment action. *See Nardello v. Twp. of Voorhees,* 377 *N.J.Super.* 428, 433–36, 873 *A.*2d 577 (App.Div.2005); *Cokus v. Bristol Myers Squibb Co.,* 362 *N.J.Super.* 366, 378, 827 *A.*2d 1173 (Law Div.2002), *aff'd o.b.,* 362 *N.J.Super.* 245, 827 *A.*2d 1098 (App.Div.2003), *certif. denied,* 178 *N.J.* 32, 834 *A.*2d 405 (2003); *see also Green, supra,* 177 *N.J.* at 438, 828 *A.*2d 883 (noting that "many separate but relatively minor instances of behavior directed against an employee ... may ... combine to make up a pattern of retaliatory behavior").

Plaintiff presented sufficient evidence that his transfer from a detective position to patrol duty resulted in both a reduction in his compensation and a loss of other benefits to satisfy this element of a cause of action under *N.J.S.A.* 34:19–3. Although plaintiff's transfer to patrol duty was not considered a demotion in rank, it resulted in a 3% reduction in his compensation. Defendants argue that this additional 3% payment was not compensation, but instead a "clothing allowance," and consequently, the loss of such an allowance does not constitute an "adverse employment action." However, the collective bargaining agreement under which plaintiff was paid the additional 3% base salary while a detective describes it as a salary "differential," and a separate section of the agreement provides for payment to every officer of "an annual shoe and clothing maintenance allowance of $850." In addition, plaintiff testified that detectives have an opportunity to earn substantially more overtime than officers assigned to patrol duty, that the 3% salary differential is reflected in the calculation of a retiring police officer's pension, and that detectives are assigned unmarked police cars that they can use to commute back and forth to work. We conclude that this alleged reduction in

compensation and loss of other benefits as a result of plaintiff's transfer from his detective position to patrol duty could support a finding that he suffered an "adverse employment action."

## C

■ The requirement that an employee who brings a CEPA claim under *N.J.S.A.* 34:19–3 must show "a causal connection exists between the whistle-blowing activity and the adverse employment action[,]" *Dzwonar, supra,* 177 *N.J.* at 462, 828 *A.*2d 893, can be satisfied by inferences that the trier of fact may reasonably draw based on circumstances surrounding the employment action, *Roach, supra,* 164 *N.J.* at 612, 754 *A.*2d 544. The temporal proximity of employee conduct protected by CEPA and an adverse employment action is one circumstance that may support an inference of a causal connection. *See Romano v. Brown & Williamson Tobacco Corp.,* 284 *N.J.Super.* 543, 550, 665 *A.*2d 1139 (App.Div.1995).

■ The record shows that plaintiff made a series of verbal and written complaints to his superiors in the Atlantic City Police Department concerning their alleged failure to enforce the laws relating to promotion of prostitution and the location of sexually-oriented businesses during the period from January to May of 2001, following which he was transferred to patrol duty on June 10, 2001. According to plaintiff, he complained to Sergeant Abrams about the removal of his files relating to promotion of prostitution investigations "more than once a week" for several months. On April 6, 2001, he sent a memorandum to Sergeant Abrams, quoted earlier in this opinion, again complaining about the removal of his prostitution intelligence files. After Abrams read this memorandum, he said to plaintiff: "You're asking for it." On May 26, 2001, plaintiff sent another memorandum to Sergeant Abrams, also quoted earlier in this opinion, complaining about Atlantic City's failure to enforce the statutory restriction on the location of sexually-oriented businesses. According to plaintiff, Captain Glass said to him shortly thereafter: "You're out of here,

you're going to patrol." Two weeks later, plaintiff was transferred to patrol duty. Consequently, the proximity of plaintiff's complaints regarding the City's alleged failure to enforce the laws relating to promotion of prostitution and the location of sexually-oriented businesses could support an inference that those complaints were the reason for his transfer.

Furthermore, there is evidence that would support a finding that the reason defendants gave for plaintiff's transfer to patrol was pretextual. On April 17, 2001, during the period plaintiff was complaining to Sergeant Abrams about the City's alleged non-enforcement of the laws relating to the promotion of prostitution, Chief Snellbaker requested the Internal Affairs Bureau to conduct an investigation into plaintiff's attendance at the 1998 wedding of the daughter of a suspected organized crime figure. On May 25, 2001, the Internal Affairs Bureau issued a report that concluded plaintiff's superiors had authorized his attendance at the wedding for the purpose of "gathering intelligence information," and that plaintiff had submitted an intelligence report after the wedding describing what he had observed and heard. Consequently, the Internal Affairs Bureau concluded plaintiff's attendance at the wedding was "justified, legal and proper." Although the Internal Affairs Bureau exonerated plaintiff of any wrongdoing in connection with his attendance at the wedding, plaintiff was told that this was the reason for his transfer to patrol duty. The implausibility of this explanation for plaintiff's transfer is an additional circumstance that could support a finding that the real reason for this adverse employment action was plaintiff's complaints about defendants' alleged failure to enforce the laws relating to promotion of prostitution and the location of sexually-oriented businesses.

We reject defendants' argument that a finding of a causal relationship between plaintiff's whistle-blowing activity and his transfer to patrol duty cannot be made because there is no evidence that Chief Snellbaker, who made the decision, knew about this activity. Although plaintiff did not present direct evidence that Chief Snellbaker was aware of his whistle-blowing

activity, a finding of the required causal connection may be based solely on circumstantial evidence that the person ultimately responsible for an adverse employment action was aware of an employee's whistle-blowing activity. *See Roach, supra,* 164 *N.J.* at 611–12, 754 *A.*2d 544. Plaintiff's April 6, 2001 memorandum to Sergeant Adams complaining about his inability to gain access to the files he had compiled regarding promotion of prostitution investigations concluded by asking Adams to forward the memorandum to Chief Snellbaker "for a response." Eleven days later, on April 17, 2001, Chief Snellbaker directed the Internal Affairs Bureau to undertake an investigation into plaintiff's attendance at the wedding of a suspected organized crime figure's daughter three years earlier. We believe that a trier of fact could infer there was a causal connection between plaintiff's memorandum concerning the City's alleged termination of promotion of prostitution investigations, in response to which Sergeant Adams said, "You're asking for it," and Chief Snellbaker's initiation of the Internal Affairs investigation. Furthermore, a trier of fact could infer from plaintiff's May 26, 2001 memorandum complaining about the City's failure to enforce the statutory restriction on the location of sexually-oriented businesses, to which Glass responded by saying, "You're out of here, you're going to patrol[,]" also was sent to Chief Snellbaker and was an additional reason for the Chief's decision to transfer him.

## IV

The dissent charges that our opinion "appears to graft a new limitation on the discretionary governance prerogatives of an employer[.]" *Infra* at 240, 903 *A.*2d at 1066. However, there is nothing novel in the proposition that a statute—in this instance the Code of Criminal Justice—constitutes a "clear mandate of public policy" within the intent of CEPA. *Mehlman, supra,* 153 *N.J.* at 188, 707 *A.*2d 1000. Plaintiff does not seek, as the dissent asserts, "to determine law enforcement policy for [the] entire [Atlantic City Police Department]." *Infra* at 241, 903 *A.*2d at

1066–67. He only seeks to avail himself of the judicial remedies provided by CEPA for the adverse employment action taken against him for objecting to the police department's alleged policy decision to cease enforcement of the Code provisions prohibiting promotion of prostitution and restricting the location of sexually-oriented businesses. Plaintiff's claim does not rest simply on his personal disagreement with this policy decision, but on an objectively reasonable belief that it "is incompatible with a clear mandate of public policy concerning the public health, safety or welfare[.]" *N.J.S.A.* 34:19–3c(3). Therefore, our recognition of plaintiff's right to pursue this claim before a jury is mandated by the State legislative policy expressed in CEPA to protect employee whistle-blowing activity.

## V

Accordingly, the judgment of the Appellate Division is affirmed.

Justice RIVERA–SOTO, dissenting.

As the majority notes, "[t]his appeal involves a claim under the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8, by a police officer who alleges he was transferred from detective to patrolman in retaliation for his objections to the Chief of Police's decision to terminate enforcement of provisions of the Code of Criminal Justice prohibiting promotion of prostitution and restricting the location of sexually-oriented businesses." *Ante,* 188 *N.J.* at 225, 903 *A.2d* at 1057 (2006). The Law Division dismissed plaintiff's complaint, the Appellate Division reinstated that complaint, and the majority affirms. *Ante,* 188 *N.J.* at 240, 903 *A.2d* at 1066 (2006). Because I concur with the well-reasoned judgment of the trial court in dismissing plaintiff's complaint, and because the majority appears to graft a new limitation on the discretionary governance prerogatives of an employer, I respectfully dissent.

## I.

In this case, a police officer alleges that his reassignment was precipitated by his complaints that the Atlantic City Police Department was not enforcing the laws against prostitution and related offenses to a degree that was personally satisfactory to that police officer. Principally relying on *Dzwonar v. McDevitt,* 177 *N.J.* 451, 828 *A.*2d 893 (2003), and *Schechter v. N.J. Dep't of Law & Pub. Safety,* 327 *N.J.Super.* 428, 743 *A.*2d 872 (App.Div. 2000), the trial court correctly framed the issue as follows: "did [plaintiff] *reasonably* believe that [defendants'] actions or inactions constituted 'misconduct' and 'illegal' or 'wrongful' activities that were incompatible with a 'clear mandate of public policy?' " Highlighting the patent absurdity that results from allowing a rank-and-file police officer to determine law enforcement policy for an entire department, the trial court narrowed the inquiry to the decision-making discretion vested in the police officer on patrol and made the common sense observation that "[i]t is self-evident that no police officer can, without prioritizing, effectively prosecute every violation of the law that comes to his or her attention." The trial court further noted that "[o]ne may reasonably conclude that a police officer should have the discretion to determine that there are legitimate priorities that would preclude the investment of the same level of resources in the enforcement of every provision of law."

Extrapolating from the discretion necessarily vested in a single police officer to that which must reside in the decision-makers responsible for law enforcement policy judgments, the trial court observed:

> The same discretionary judgment should apply to the decisions by supervising police personnel to prioritize, as they deem appropriate, the allocation of time, attention, personnel, and other resources to the investigation and prosecution of offenses such as those at issue here. It would be an unsupportable extension of the purposes and application of the [CEPA] statute, as interpreted by any reported decision, to afford to every police officer the ability, under the authority of a CEPA claim, to hold his or her department accountable to the officer for any discretionary determinations of resource allocation and law enforcement priorities solely because those determinations differed from the officer's views.

> Moreover, [plaintiff's] position raises as many problems as it "solves." If he is correct, then any police officer could seek to hold a police department accountable pursuant to CEPA not only for [the] investigations or prosecutions it does not undertake, as is [plaintiff's] concern here, but also for complaints about how aggressively and with what resources the battle is fought in those instances where the department does determine to act. CEPA should not, and I believe does not, have this reach.

The trial court thus concluded that

> [t]he alleged "misallocation" of resources and priorities by [defendants] and their "failure to enforce" the law, even if indeed that is what it was, did not violate any "clear mandate of public policy" because there is no such mandate that precludes this type of discretionary judgment.... It would be manifestly inappropriate to substitute, for the City's judgment, [plaintiff's] view or that of a court or jury with regard to the appropriate priorities for applying the law enforcement resources available to the City.
>
> Inasmuch as the City had the discretionary authority to make the determinations that it made in the absence of a clear mandate of public policy to the contrary, and in view of the fact that [defendants'] actions were not "illegal" or "wrongful" in and of themselves, [plaintiff's] belief that [defendants'] actions constituted "misconduct" and were incompatible with a clear mandate of public policy was not "objectively reasonable" as a matter of law....

I cannot improve on the clear, logical and compelling thoughts expressed by the trial judge. Therefore, I would reverse the judgment of the Appellate Division and reinstate the trial court's dismissal of plaintiff's complaint. For that reason alone, I respectfully dissent.

## II.

There is a further notion in the majority's reasoning that is particularly troublesome. According to the majority, "[t]o prevail on a CEPA claim under 3c(3), plaintiff is not required to show that defendants' alleged policy decision to cease enforcement of the provisions of the Code prohibiting the promotion of prostitution and restricting the location of sexually-oriented businesses actually violated or was incompatible with a statute, rule or other clear mandate of public policy." *Ante,* 188 *N.J.* at 233, 903 *A.2d* at 1062 (2006) (citation omitted). The majority explains that "[p]laintiff only has to show that he had an objectively reasonable belief in the existence of such a violation or incompatibility." *Ante,* 188

*N.J.* at 233, 903 *A.*2d at 1062 (2006) (citation and internal quotation marks omitted). The majority then concludes that

[p]laintiff may carry this burden by demonstrating that there is a substantial nexus between the complained-of conduct—the cessation of investigations of promotion of prostitution and failure to enforce laws relating to the location of sexually-oriented businesses—and [the] law or public policy identified by ... plaintiff—in this case the provisions of the Code proscribing such criminal conduct.

[*Ante,* 188 *N.J.* at 233, 903 *A.*2d at 1062 (2006) (citation and internal quotation marks omitted).]

Under the majority's view, a municipality now must be governed by its lowest common denominator or risk the imposition of liability. Stripped to its essence, the majority rules that plaintiff's claim survives summary judgment not because of any wrongful municipal action, but because "[p]laintiff was not told, and had no other reason to believe, that this alleged policy decision [to limit the resources assigned to combat the promotion of prostitution or sexually-oriented businesses] was due to budgetary constraints or an administrative determination that there was a need to assign additional officers to the investigation of more serious crimes." *Ante,* 188 *N.J.* at 235, 903 *A.*2d at 1063 (2006). That turns the basis of the employer/employee relationship on its head, requiring that, in order to avoid a potential CEPA lawsuit, an employer must explain every discretionary decision to the satisfaction of every line employee. That was never CEPA's purpose or intendment.

I, therefore, respectfully dissent.

*For affirmance*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, and SKILLMAN (t/a)—6.

*For reversal*—Justice RIVERA-SOTO—1.