**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."  Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited.  R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2904-19

MARGARET GATHMAN,

      Plaintiff-Appellant,

v.

CARE ONE MANAGEMENT, LLC,
ELIZABETH STRAUS, and
THOMAS MCKINNEY,

      Defendants-Respondents.

_____

Argued December 15, 2021 – Decided February 22, 2022

Before Judges Sumners and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-5015-17.

R. Armen McOmber argued the cause for appellant (McOmber McOmber & Luber, PC, attorneys; Lauren M. Hill, of counsel and on the briefs; Peter D. Valenzano and R. Armen McOmber, on the briefs).

Michael J. Dee argued the cause for respondents (O'Toole Scrivo, LLC, attorneys; Thomas P. Scrivo and Michael J. Dee, of counsel; Nicole M. DeMuro, on the brief).

PER CURIAM

Plaintiff Margaret Gathman appeals the Law Division's summary judgment order dismissing with prejudice her first amended complaint alleging that defendants Care One Management, LLC (Care One), Thomas A. McKinney, and Elizabeth Straus terminated her employment in violation of the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, and common law under Pierce v. Ortho Pharm. Corp., 84 N.J. 58 (1980). We reverse and remand for trial because we agree with Gathman that there are genuine issues of material facts regarding the reasons for her termination, and that she can decide prior to trial whether she wants to pursue her CEPA or Pierce claim.

I

In this appeal, our recitation of the facts is derived from the evidence submitted by the parties in support of, and in opposition to, the summary judgment motion, viewed in the light most favorable to the non-moving party, Gathman, and giving her the benefit of all favorable inferences. Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (citing R. 4:46-2(c)).

Care One is a management company providing services to various post-acute nursing and assisted living facilities on the east coast, including approximately thirty facilities in New Jersey. Gathman was initially employed

2

by Care One in 2005, as a Regional Business Office Manager. After rising to the position of Assistant Regional Controller, she resigned for personal reasons in July 2012.

In the spring of 2015, Gathman was contacted by Care One's Chief Strategy Officer, Timothy Hodges, about meeting with Straus, Care One's Executive Vice President, to discuss returning to the company. According to her, Hodges sought her out because of her past "success[] turn[ing] facilities around and collect[ing] the monies that the company needed to operate, put[ting] systems in place[,] and [doing] training on a broad scale." After meeting with company executives, Straus, Michael Shea, Controller, Daniel Straus, Chairman and Chief Executive Officer, and Alberto Lugo, Executive Vice President and General Counsel, Gathman returned to Care One as Director of the Shared Business Office on August 19, 2015.

A month or so later, Gathman discovered the company was exposed to liability for violating the law by not returning overpayments. She discovered that overpayments and security deposits owed to Medicare, Medicaid, and other entities and individuals for residents who died were overdue. In one case, she determined that $50,000 in a resident's personal needs checking account in one of their facilities was illegally retained for over a year after the resident died.

A-2904-19

Although funds needed to be returned, she believed it was not a "number one priority" at the time because she was more focused on the "tremendous amount of outstanding receivables."

A couple of months later, Gathman determined she had to give attention to refunding overpayment as well as improving the collection of money owed to Care One. The failure to return overpayments to the federal government posed a liability to the company under Section 1128J(d) of the Patient Protection and Affordable Care Act, 124 Stat. 119 (2010).[1] In January, February, and March of 2016, Gathman issued reports regarding the extent of the unreturned overpayments and liability to her supervisor, Shea. During a meeting, Shea stated that Care One's management team would not be pleased about this problem, and she should create a plan—without having to hire additional staff——to tackle the issue before presenting it to management. According to Gathman,

---

[1] Section 1128J(d) of the Affordable Care Act, which took effect on March 23, 2010, requires a person who "has received an overpayment" from the federal government to report and return the overpayment and to provide, in writing, a reason for the overpayment. 42 U.S.C. § 1320a-7k(d)(1). The overpayment must be reported and returned within sixty days after the date on which the overpayment is "identified" or, if applicable, the date any corresponding cost report is due, whichever is later. Id. § 1320a-7k(d)(2). The requirement to report and return an overpayment within this deadline is defined as "an obligation" within the meaning of the False Claims Act, 31 U.S.C. §§ 3729-3733. Id. § 1320a-7k(d)(3).

A-2904-19

she kept senior management, including Straus and Lugo, abreast of her progress on the retained funds via monthly meetings and written progress reports, and expressed concern over the company's non-compliance in returning them, estimated to be as much as $13 million with further investigation needed to settle the actual amount.

In April 2016, Shea was terminated from Care One. Lugo, who informed Gathman that Shea's termination had "to do with th[e] whole credit mess[,]" stated she would now report to him and Straus.

On August 4, Straus advised Gathman that she was being considered for the position of Vice President of Finance. The day before, Gathman emailed McKinney, Lugo, Straus, Hodges, and others a report (August 3 report) providing that she had returned "large sums of money," identified as "true credits" owed to Medicare, Medicaid, individuals, and entities, which were unlawfully held by Care One. Credits totaling approximately $3 million had been returned in the first six months of 2016, roughly $500,000 a month. Because Care One's monthly revenue for New Jersey facilities was roughly $30 to $32 million a month, Gathman believed returning the owed funds at that rate would not "have a drastic impact on [the company's] cash flow [and] it would help [the company] to get compliant within a year, year and a half."

5                                    A-2904-19

On August 12, 2016, McKinney, Senior Vice President and Deputy General Counsel, delivered a letter—signed only by him—to Gathman stating she was terminated that day because "of certain things that have come to light recently, the organization has lost confidence in [her] ability to effectively perform in [her] role" and her position was eliminated due to restructuring. In a meeting with McKinney and Christina Lopez from Human Resources, Gathman claimed she was told Straus made the decision to terminate her. Straus, however, deposed that she did not know Gathman and was not involved in terminations. McKinney deposed that it was Lugo who made the decision to terminate Gathman, but in speaking to Lugo about the action, he did not specify the performance issues "the organization" had with her or why her position was being eliminated.

Lugo deposed that while Gathman was providing him reports documenting the refunds she was authorizing, he was also receiving financial reports from the New Jersey facilities as well as outside facilities. He identified "trends . . . concerning [her role,]" which caused him to lose confidence in her ability. In addition, he stated he spoke with a former employee, Angela Bayarovich, one of Gathman's subordinates, who indicated she would not return to Care One because she was "uncomfortable with []Gathman's managerial

A-2904-19

style." Lugo also testified that an August 11, 2016 report (August 11 report) by Steven Lancman, the company's then-Vice President of Finance, showed that the New Jersey facilities, which Gathman oversaw, were behind all other regions in reducing the credit balance or keeping them static; New Jersey's credit balances "increased by [twenty-three percent] from January to July 2016."

II

In Gathman's first amended two-count complaint,[2] she alleges defendants wrongfully terminated her in violation of CEPA and Pierce because she advised in her August 3 report that she returned $3 million dollars in overpayments to Medicare, Medicaid, and individuals. Care One asserts she was terminated because information contained in the August 11 report conflicted with prior Gathman-authored reports regarding the status of Care One's overall credit balance in New Jersey, causing the company to lose confidence in her ability to perform her job duties.

Following discovery, defendants moved for summary judgment dismissal of all claims with prejudice. The motion court granted summary judgment, setting forth its reasoning in a ten-page, single-spaced rider to its order.

---

[2] Linda Martin, Alberto Lugo, and Daniel Straus were named defendants in Gathman's initial complaint but were not named defendants in the first amended complaint.

7

The court determined that while Gathman had "asserted a prima facie cause of action under the first three elements of CEPA[,]" she failed to make a prima facie showing of the fourth and last element: a causal connection between her whistle-blowing activity through her August 3 report and her termination on August 12. The court explained:

> [it] does not accept that the whistle[-]blowing activity began with the August 3 [report], wherein Gathman allegedly informed Care One that she returned $3 million in overpaid credits to Care One's customers. Gathman began to inform Care One about the large amount of outstanding overpaid credits, which were not being paid back in a timely manner, starting in January 2016. In January 2016, Gathman notified Care One that Care One was in possession of $6.5 million credits that were either overpaid or not reconciled with a corresponding account. Gathman was not terminated until [eight] months later in August 2016. Every month, Gathman provided Care One with a report, which noted the amount of "overpaid credits." The [c]ourt also notes that all the parties agree that credit collection is a naturally occurring phenomenon in the health care industry and managing the credits is imperative to the financial health of any health care facility.
>
> . . . .
>
> Gathman fails to present any evidence of a pattern of antagonism on behalf of Care One. Lugo's alleged failure to respond to an email that did not solicit a response is not a pattern of antagonism. . . . There is no evidence that []Lugo or any other officer of Care One objected to or refused to accept Gathman's Progress

8

Reports and "Solutions" contained therein. . . . The record is devoid of any conduct or pattern of antagonism on behalf of Care One or []Straus that followed the [June 11, 2016] email to justify that retaliatory discrimination was more likely than not a determinative factor in the decision to terminate Gathman. The record is also devoid of any conduct or pattern of antagonism on behalf of Care One that followed the alleged [August 3 report], even if the court were to isolate that report from the earlier monthly Gathman[-]authored reports.

Assuming Gathman could make a prima facie showing of the causal connection between her whistle-blowing activity and her termination, the court found she could not establish "that Care One's non-discriminatory reason [for terminating her employment] was pretextual." The court reasoned that Gathman did not dispute the legitimacy of the August 11 report detailing the twenty-three percent increase in New Jersey's credit balance, and "Gathman's personal disagreement with Lugo's reliance on and interpretation of the [report] is insufficient to show pretext." The court rejected Gathman's assertion that management did not welcome reports of credits owed to federal and state entities, as well as individuals, based upon Shea's comments and her perception of McKinney's disinterest in her concerns about illegal retention of overpayments. The court also determined Gathman's assertion that Straus told her she was being considered for a promotion "does not tend to demonstrate

weaknesses in Care One's proffered business reason for Gathman's termination" because Straus knew nothing about the company's collections, and her comment about the promotion "ha[d] nothing to do with . . . Lugo's perception of [her] performance" given the credit balance issue.

Even though Gathman pointed to various encounters where Lugo ignored her or received a brush off from defendants as dispositive evidence, the court found that it did not discredit Care One's reason to terminate her.

> A factual dispute as to whether []McKinney is diligent, shrewd, or competent is not a material dispute to defeat the within motion.
>
> . . . .
>
> Such actions would not allow a jury to reasonably find that []Lugo had animosity towards Gathman. The fact that Lugo could not recall specific one-on-one interactions or dealings he had with Gathman does not tend to show that Lugo or Care One harbored discriminatory animus towards [her].

The court rejected Gathman's attack on Lugo's credibility based on differences in his deposition testimony and his summary judgment affidavit—e.g., inability to recall Lancman's position and who wrote the August 16 report—as a reason summary judgment must be denied. The court ruled it:

> decline[d] to accept Gathman's argument that Lugo's affidavit materially contradicts [his] deposition. With respect to the issue of whether a question of fact can be

10

created by an affidavit contradicting the affiant's deposition, New Jersey [c]ourts have adopted the "sham affidavit" doctrine and hold that an inconsistent affidavit will not be regarded as sham, submitted for the sole purpose of defeating summary judgment if the contradiction is plausibly explained. Shelcusky v. Garjulio, 172 N.J. 185, 200-202 (2002). Any perceived "inconsistences" in Lugo's affidavit are plausibly explained by Lugo's deposition or the manner in which it was or was not conducted.

The court also granted summary judgment on the specific claims of

retaliation against McKinney and Straus, holding:

As a preliminary matter, Gathman's assertion that Straus was somehow involved in [her] termination is based entirely on hearsay. A member of Care One's HR department "was told" that Straus decided to terminate Gathman. However, Gathman failed to elicit such testimony from any other employee of Care One, including []Straus. The record is void of any evidence to show that []Straus initiated the first discussion regarding termination and the dissolution of the subject department. In fact, []Straus testified that she was not involved in the collections department and had not been involved in the decision to terminate Gathman. Moreover, Lugo testified that he did not discuss his decision to terminate Gathman with []Straus. . . . []Straus testified she never had a conversation with anyone, including Lugo, to discuss any reason for Gathman's termination.

. . . .

Gathman asserts that McKinney blew [her] off in June 2016[,] when [she] attempted to have a conversation about Care One's collectables, but a showing that McKinney may be, at most, cold, is not enough to establish that the proffered reason for Gathman's termination was pretextual. This [c]ourt

11

also notes that Gathman's alleged dealing with McKinney occurred several months before Gathman's termination. A jury could not reasonably find a causal connection between McKinney's alleged actions and Gathman's termination. Furthermore, Gathman has not set forth any evidence to show that McKinney was actively involved or participated in [her] termination, other than him rubberstamping the termination letter containing Lugo's proffered reason for her termination.

Here, Gathman presented no evidence that McKinney was aware of the August 3 [report] where Gathman allegedly reported that she returned $3 million in overstated credits.

Lastly, the court granted summary judgment dismissal of Gathman's Pierce wrongful discharge in violation of public policy claims because they were not factually distinct from the dismissed CEPA claims.

### III

We review a grant of summary judgment de novo, applying the same standard as the motion court. Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 330 (2010). Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). We consider whether "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed

issue in favor of the non-moving party."  Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

To establish a prima facie case under CEPA, a plaintiff must prove:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;
>
> (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c);
>
> (3) an adverse employment action was taken against him or her; and
>
> (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.
>
> [Lippman v. Ethicon, Inc., 222 N.J. 362, 380 (2015) (quoting Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003)).]

"The evidentiary burden at the prima facie stage is 'rather modest . . . .'"  Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (2005) (quoting Marzano v. Comput. Sci. Corp., 91 F.3d 497, 508 (3d Cir. 1996)).  Moreover, "[t]hese requirements must be liberally construed to effectuate CEPA's important social goals."  Maimone v. City of Atl. City, 188 N.J. 221, 230 (2006).  CEPA prohibits employers from retaliating against an employee who:

13

a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ; or

(2) is fraudulent or criminal . . . ;

b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer . . . ; or

c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ;

(2) is fraudulent or criminal . . . ; or

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

[N.J.S.A. 34:19-3.]

CEPA defines "retaliatory action" as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e). Once a plaintiff establishes the four elements outlined in Dzwonar, the burden shifts to the defendant to "advance a legitimate, nondiscriminatory reason for the adverse

conduct against the employee." Klein v. Univ. of Med. & Dentistry of N.J., 377 N.J. Super. 28, 38 (App. Div. 2005). "If such reasons are proffered, plaintiff must then raise a genuine issue of material fact that the employer's proffered explanation is pretextual." Id. at 39.

Here, the motion court ruled Gathman established the first three prongs of a prima facie CEPA claim but did not satisfy the fourth prong that a causal connection existed between her whistle-blowing activity and her termination. To meet this prong, Gathman was required to demonstrate "evidence of circumstances that justify an inference of retaliatory motive." Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 550 (App. Div. 1995); see also Maimone, 188 N.J. at 237 (noting this prong "can be satisfied by inferences that the trier of fact may reasonably draw based on circumstances surrounding the employment action"). Evidence of such circumstances may include "[t]he temporal proximity of employee conduct protected by CEPA and an adverse employment action," Maimone, 188 N.J. at 237, but "[t]emporal proximity, standing alone, is insufficient to establish causation," Hancock v. Borough of Oaklyn, 347 N.J. Super. 350, 361 (App. Div. 2002).

To establish a causal connection between the protected activity and the retaliation, causation "may be demonstrated by evidence of circumstances that

justify an inference of retaliatory motive," and the evidence of pretext may serve that function. Romano, 284 N.J. Super. at 550-52. The temporal proximity of protected activity followed by an adverse employment action is usually insufficient by itself to establish the causal connection. Young v. Hobart W. Grp., 385 N.J. Super. 448, 467 (App. Div. 2005). New Jersey applies the burden-shifting approach developed under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), which applies to CEPA retaliation claims. Massarano v. N.J. Transit, 400 N.J. Super. 474, 492 (App. Div. 2008).

The McDonnell Douglas approach requires a plaintiff to establish a prima facie case of discrimination. 411 U.S. at 802. Once a prima facie case is established, the second prong of the McDonnell Douglas test requires the employer "to articulate some legitimate, nondiscriminatory reason for" its action. Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981) (quoting McDonnell Douglas, 411 U.S. at 802). That is not a burden of persuasion, which "remains at all times with the plaintiff." Ibid. The employer only needs to "articulate" a nondiscriminatory reason for its action "with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." Id. at 253, 255-256.

A-2904-19

Indeed, the employer never has the burden of proving that its proffered reason was the actual reason for its action, "because the burden of proving the actual discrimination lies at all times with the plaintiff." Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997). The employer's articulation must be "taken as true," and the court's evaluation of it during this second part of the McDonnell Douglas test "can involve no credibility assessment." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).

If the employer articulates a nondiscriminatory reason, the plaintiff loses the benefit of the presumption established by the prima facie case. Burdine, 450 U.S. at 255-56. To survive the employer's motion for summary judgment, the plaintiff must present "evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely th[a]n not a motivating or determinative cause of" the action in question. Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994).

The plaintiff's evidence of pretext may be indirect, Burdine, 450 U.S. at 256, or circumstantial, Mandel v. UBS/PaineWebber, Inc., 373 N.J. Super. 55, 75 (App. Div. 2004). It may even be simply the incredibility of the employer's

proffered reason, which, in conjunction with the prima facie case, may be legally sufficient to support the inference that the alleged discriminatory reason was an actual one. St. Mary's, 509 U.S. at 511.

The plaintiff does not have to show that the prohibited reason was the employer's sole reason, but rather that it may have been one of the employer's "but[-]for" reasons. Fuentes, 32 F.3d at 764. However, while employers may not act for a prohibited purpose, they are free, when unlawful discrimination is not a factor, to make personnel decisions objectively or subjectively, and in a manner that is unpopular with the employees. Maiorino v. Schering-Plough Corp., 302 N.J. Super. 323, 345-46 (App. Div. 1997).

Gathman contends the motion court's summary judgment dismissal of her complaint was based on its erroneous finding that she failed to establish a prima facie case of CEPA fourth prong violation — causal connection between her whistle-blowing activity and her termination. She argues summary judgment was not proper given there is a genuine issue of fact regarding why she was terminated. She emphasizes the court usurped the jury's role by acting as a factfinder to make credibility determinations in defendants' favor, concluding she was terminated for the reasons defendants contended. For support, she relies upon In re Estate of DeFrank, 433 N.J. Super. 258, 266 (App. Div. 2013), where

we held "it is ordinarily improper to grant summary judgment when a party's state of mind, intent, motive or credibility is in issue."

Gathman specifically argues the temporal proximity between her termination on August 12 and her August 3 report to management that she had returned $3 million was enough to "give[] rise to an inference of retaliation[,]" from which a jury could "reasonably determine" that defendants' given reasons for her termination were a pretext. She contends there are numerous "issues of witness credibility directly relevant to" her termination. This includes the fact that Straus told her eight days before she was terminated that she was being considered for a promotion; Lugo deposed he did not know who she was or anything about her job performance despite signing her termination letter; the company's Director of Compliance, Linda Martin, deposed that Gathman was a hard worker and she was pleased with the progress Gathman was making in resolving certain compliance-related issues, including refunding overpayments; and Gathman had not been warned or informed of any problems concerning her job performance prior to her termination.

Viewing the evidence in the light most favorable to Gathman, we conclude the motion court erred in finding she did not establish a prima facie claim that her termination was in retaliation for returning $3 million to Medicare,

19

Medicaid, and other entities and individuals. There was a genuine issue of material fact regarding whether there was temporal proximity between her whistle-blowing and her termination. The court found that too much time had elapsed to establish a connection between whistle-blowing and termination when Gathman initially notified Care One in her January 2016 report that the company was illegally retaining overpayments and she began making refunds, and her termination on August 12, 2016. However, Gathman was terminated within days of her August 3 report quantifying, for the first time, that she had refunded some $3 million. Granted, Lugo received a report days later, on August 11, that the credit balances in Gathman's region were twenty-three percent higher than other regions. However, she correctly questions the legitimacy of that justification by pointing out she was recruited to return to Care One because of her demonstrated competence and was on the verge of a promotion due to her performance according to her supervisor, yet she was given no opportunity to discuss the August 11 report findings and her response to that report with Lugo or any other senior executive. While her progress reports detailing the extent of the unreturned overpayments and liability commenced in January 2016, there is an important distinction between identifying the overpayment liability and advising what needs to be done versus informing

senior management in the August 3 report that she returned $3 million. As for defendants' arguments to the contrary that they lost confidence in Gathman, there is a genuine dispute of material facts and, to Gathman's favor, an inference of causality for her termination eight days after she illuminated the amount of money she refunded. Due to genuine issues of material facts, the court should not have made credibility assessments of the proffered facts and applied those findings more favorably to defendants to find that Gathman did not establish a prima facie CEPA claim of retaliation. For example, there were conflicting facts regarding Lugo's knowledge of Gathman's role in the company: his deposition asserted he was unaware of her job duties, job performance, or who evaluated her, in contrast with his summary judgment certification detailing his expectation of her job duties and performance. Yet, the court accepted his representation that she was terminated because the company lost confidence in her ability to do her job.

As for defendants McKinney and Straus, the court should not have acted as a factfinder in dismissing the claims against them. Individual defendants can be held liable for terminating an employee for "personally participat[ing] in the tort of wrongful discharge." Ballinger v. Delaware River Port Auth., 172 N.J. 586, 608 (2002). It is contended that "neither []McKinney nor []Straus was

21

responsible for the decision to terminate her employment[,]" claiming Lugo made the decision. The finding that there was no evidence McKinney was "actively involved or participated in Gathman's termination, other than him rubberstamping the termination letter containing Lugo's proffered reason for her termination" is disputed, as it did not credit Gathman's allegations. The record indicates that McKinney was aware of Gathman's reporting of the illegally retained overpayments and her refunding of $3 million. His letter does not assert the decision to terminate Gathman was made by Lugo or any other Care One decision maker. There appears to be no basis in the record to conclude McKinney's action was merely an administrative formality lacking any input on his part. Giving Gathman's assertions the benefit of favorable inferences, a reasonable factfinder could conclude that McKinney's signature on the letter was indicative of his input in her termination.

While the claims against Straus may not be as strong as those against McKinney, Gathman alleged that McKinney and Lopez admitted that Straus made the decision to terminate her. Straus denied any input. Straus's credibility suffers a hit given her claim that despite being an executive vice president, she had no understanding of the company's account receivables or collections and what Medicare or Medicaid are. Gathman's contention that she reported to

22

Straus and Lugo, and that Straus was fully aware of the $3 million in refunds she made, would certainly allow a factfinder to reasonably conclude Straus had input in the termination decision. And, if Gathman was up for a promotion on August 4, as Straus allegedly told her, why would her position be eliminated, and she be terminated days later? Considering these disputed material facts, the motion court should not have favored Straus's position in granting summary judgment, and thus dismissing Gathman's contention that Straus was involved in the decision to terminate her.

As for Gathman's Pierce claim, it is based upon our Supreme Court's recognition "that an [at-will] employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." Pierce, 84 N.J. at 72. "The sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions." Ibid. CEPA falls with Pierce's ambit because the law constitutes public policy, as "[t]he Legislature enacted [it] to 'protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.'" Dzwonar, 177 N.J. at 461 (quoting Abbamont v. Piscataway Township Bd. of Educ., 138 N.J. 405, 431

23

(1994)).   Because we conclude Gathman's CEPA claim should not have been dismissed, her Pierce claim remains viable for the same reasons.

Under CEPA's waiver provision, however, "the institution of an action in accordance with [CEPA] shall be deemed a waiver of the rights and remedies available under any other . . . State law."   N.J.S.A. 34:19-8.   The provision "applies only to those causes of action that require a finding of retaliatory conduct that is actionable under CEPA.   The waiver exception does not apply to those causes of action that are substantially independent of the CEPA claim." Young v. Schering Corp., 141 N.J. 16, 29 (1995).   "Parallel claims based on those rights, privileges and remedies are waived because they represent multiple or duplicative claims based on retaliatory discharge."   Ibid.

Since Gathman's CEPA and Pierce claims are based upon the same facts, she must elect which claim to pursue at trial.   Yet, she has a right to wait until a pretrial conference to pursue her claim.   Ibid. at 32 ("The meaning of 'institution of an action' [under N.J.S.A. 34:19-8] could conceivably contemplate an election of remedies with restrictions in which the election is not considered to have been made until discovery is complete or the time of a pretrial conference contemplated by Rule 4:25-1.").

We express no opinion on whether Gathman can prove adverse employment by defendants in retaliation for her whistle-blowing activity. We merely conclude summary judgment should not have been granted to defendants because there were genuine issues of material facts regarding her claims that defendants' action violated CEPA and Pierce.

Reversed and remanded for trial for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2904-19