**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3011-23

AMY NIELSEN, f/k/a
AMY MAGUIRE,

    Plaintiff-Appellant,

v.

COUNTY OF CAPE MAY and
LIEUTENANT STEPHEN
PRINCE,

    Defendants-Respondents.

_____

Submitted January 13, 2026 – Decided January 27, 2026

Before Judges Firko and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Cape May County, Docket No. L-0220-19.

Ionno & Higbee Attorneys at Law, LLC, attorneys for appellant (Robert D. Novicke, Jr., and Sebastian B. Ionno, on the brief).

Cooper Levenson, PA, attorneys for respondents (Jennifer B. Barr, Russell L. Lichtenstein, and Katlin L. Trout, on the brief).

PER CURIAM

Plaintiff Amy Nielsen appeals from the April 22, 2024 trial court order granting defendants the County of Cape May (County) and Lieutenant Stephen Prince summary judgment dismissal of her complaint alleging Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19 -1 to -14, claims. Having reviewed the record, parties' arguments, and applicable law, we affirm.

I.

We derive the following material facts from the summary judgment record, viewing them in a light most favorable to Nielsen, the non-moving party. See N.J. Coal. of Auto. Retailers, Inc. v. Ford Motor Co., 261 N.J. 348, 357-58 (2025). The Cape May County Sheriff's Office (CMCSO) hired Nielsen as a corrections officer (CO) in 2009. In November 2015, the CMCSO promoted Nielsen to sergeant and made her a squad commander. She retired in April 2022.

In approximately 2015, the County authorized the construction of a new jail, which opened in January 2019. The original jail had single cell housing, known as linear housing, which stationed COs outside of the inmates' housing units. The new jail was constructed with an open housing layout, known as direct supervision, which stationed COs with the inmates near the housing units. In planning for the new jail facility, the CMCSO's administration staff had

A-3011-23

transition oversight. The administration staff included the CMCSO's Undersheriff John Maher, Warden Don Lombardo, Captain Charles Magill, and Prince. The administration staff reviewed and evaluated the number of COs required for the new facility by using information from the Institute of Corrections, consultants, and other staffing resources.

In January 2017, Lombardo and Magill assigned Nielsen to a five-person jail transition team. The transition team's assignment was to "assess day-to-day operations" in direct supervision jails and report to the CMCSO operations suggestions for the new jail. The transition team visited direct supervision correctional facilities in Salem and Ocean Counties.

On March 14, 2017, Nielsen submitted a special report for the transition team to the administration staff. In addition to day-to-day operations issues, Nielsen commented on future manpower concerns in the report, stating:

> I was also amazed by the amount of staffing that the[ Salem County] facility had. Each post was covered with the right amount of people. No one was stressed about getting the job done, because someone was always there to help them. I observed the daily running of their facility and found that in a direct supervision setting, you can[no]t "pull" [CO]s from posts because i[t] just is not possible. When there is a code, you are not leaving your post to respond. The manpower has to be there to successfully run a direct supervision facility[,] or it just does not work. Safety is of the u[t]most importance and having the manpower to make

3

it work seems to be why Salem County functions at the level they do. While I feel that our facility is able to function with the manpower we currently have, I have concerns that in a direct supervision atmosphere, we are not at a staffing level that will allow us to operate in the manner which is needed.

On March 27, 2017, Nielsen submitted another special report that included the following:

For the safety and security of all staff, I believe that our manpower needs to increase. I do not see how, after touring two (2) separate facilities, we can safely and securely maintain proper control over a [c]orrectional [c]enter with the level of staffing that we currently have. I also believe that we need to have a set group of [r]esponse [t]eam members who are ready at all times, not minutes away from responding. I believe that it is up to us to ensure the new facility is the safest, most secure[,] and best all-around facility it can be.

Prince and Magill believed Nielsen's submitted reports regarding the operations at direct supervision facilities were well done, but her manpower opinions for the future jail exceeded the scope of the transition team's assignment. Nielsen and the transition team were not assigned to assess future manpower and employee retention needs, and Nielsen did not have knowledge of the number of people employed by the CMCSO. Lombardo expressed dissatisfaction with the transition team's seeming unilateral expansion of the

4

responsibility. On May 6, 2017, Nielsen submitted a third special report that did not discuss manpower.

To address jail employee performance and disciplinary issues, the CMCSO instituted a Supervisory Investigations (SI) process to review employees' conduct not warranting an Internal Affairs (IA) investigation. An SI determination could result in a Guardian Tracking entry (Guardian entry), which was a maintained computerized system memorializing information surrounding a CO's performance. Additionally, an SI could result in a copy of a written Summary of Counseling, a written warning, or no action. A Summary of Counseling generally consisted of a brief written description of an oral warning or other action given to the CO. An SI that the administration staff deemed more serious could be referred for an IA investigation.

In April 2017, Nielsen was the subject of an IA investigation related to an inmate's allegation she withheld a blanket. Nielsen admitted to withholding the inmate's blanket and the complaint was sustained. She received a Summary of Counseling on June 9, for neglect of the performance of her duty.

In May 2017, Nielsen and at least one other CO were the subjects of an SI concerning the use of an inmate electronic monitoring bracelet. Nielsen received no discipline after the investigation. The CMCSO provided electronic

monitoring training to COs. On May 17, 2017, Nielsen was the subject of an SI regarding a cell gate that malfunctioned, which also resulted in training for COs. Nielsen was not disciplined.

On May 26, 2017, Prince emailed Nielsen requesting the submission of the transition team's completed documents. Prince required Nielsen to "submit any completed material as it pertains to Training guides/Power Points/Orientation manuals for Inmates/Officers etc., by Tuesday, May 30, 2017[,] for review." Nielsen interpreted the email as requiring her to fully complete the transition team's assignment "in advance of the [established September] deadline." Based on her assumption that a new deadline was imposed, Nielsen advised Prince the materials were incomplete and there was not "enough time." Nielsen also alleged that during a meeting in May 2017, Prince instructed her regarding inmate discipline to be "less mean and compromise on some things," but there was no investigatory or disciplinary action. She was upset by the instruction.

In June 2017, Nielsen met with Jeffrey Lindsay, Esq., the Human Resources Director, who was overseeing Nielsen's department's performance reviews. Nielsen explained feeling "singled out" and retaliated against by superiors after she expressed manpower concerns for the future jail. Lindsay

A-3011-23

raised Nielsen's dating relationship with Sergeant William Nielsen, a coworker she later married. She relayed that William Nielsen told her he also felt retaliated against after he was issued a negative performance evaluation of a politically well-connected CO. Nielsen later met with Maher to discuss her concerns. The meeting made her uncomfortable because Prince, who she thought was retaliating against her, was present at the meeting and "sitting across" from her. She alleged Maher instructed her to advise Lindsay she was not pursuing the claim.

In July 2017, an IA investigation was opened against Nielsen related to an SI involving an inmate's complaint of mold. She acknowledged the inmate had complained of mold, she did not record it in a CMCSO logbook as required, and she had previously received a write up in 2015 for failure to follow mold procedures. Because she failed to document the mold complaint, Nielsen received a written warning. Also in July 2017, Nielsen received a Guardian entry for failing to be present for a jail walkthrough. She acknowledged not being in there for the walkthrough but explained to Prince she had already left work for the day. While Nielsen felt the Guardian entry was unnecessary, she did not dispute the underlying facts, and Maher and Lombardo informed her the entry was "not negative." In August 2017, the administration staff opened

7

another SI and Nielsen was asked to submit two reports on security and discipline communication between the administration staff and the sergeants. She was not disciplined.

In October 2017, Nielsen was interviewed for the position of lieutenant from the civil service list.[1] Nielsen believed the interview environment was hostile because Lombardo barely stood to greet her, shook her hand lightly, and asked her inappropriate questions regarding COs' discussions surrounding politics and the upcoming Sheriff's election. The promotion was awarded to Prince who was first on the civil service list and had been performing the job in an acting role. Nielsen claimed Prince had sent emails that belittled her.

In November 2017, Prince called Nielsen because inmates had complained another CO had prohibited handwashing before meals. Prince advised Nielsen that inmates must be permitted to wash their hands. She alleged Prince asserted he could not help her if another inmate complained. At a staff meeting the same month, Nielsen raised manpower concerns regarding shifts that Prince

---

[1] The Civil Service Commission oversees civil service job titles to "provide for . . . [t]he establishment and cancellation of eligible lists." N.J.S.A. 11A:4-4; see also In re Carluccio, 426 N.J. Super. 15, 30 (App. Div. 2012).

A-3011-23

preapproved. Prince did not acknowledge his staffing error, which resulted in Magill harshly criticizing Nielsen in front of others.

On November 29, 2017, Nielsen was the subject of an SI because COs under her supervision failed to photograph discovered contraband as required after an inmate search. The SI addressed that the shakedown was conducted "below minimum manpower," the COs acted without Nielsen's confirmation, and she worked seventeen hours without authorization. Nielsen did not dispute the allegations and accepted responsibility. As a result, Nielsen received a Guardian entry.

On December 13, 2017, an SI was opened because Nielsen sent a visibly upset CO home on unauthorized leave without notifying the administration staff. Nielsen was instructed to comply with the administrative requirements and received a Guardian entry. All CMCSO's sergeants received training on the administrative leave policy.

In January 2018, Nielsen reported that Lieutenant Vincent Terinoni used a negative tone during a meeting about an earlier SI, which offended her. She expressed her concern to Magill but never received a response. In May 2018, after another SI was completed, Nielsen and five other sergeants received

9

Guardian entries because there were errors regarding the number of cameras and controllers listed in supervisory reports.

On August 4, 2018, Nielsen reported harassment in an employee survey. About ten days later, she sent a report providing a detailed explanation of her claims.

On August 15, 2018, Nielsen was the subject of an SI regarding her completion of a medical clearance form endorsing a particular CO's ability to complete job functions while on prescribed medication. After she signed the form, Nielsen had liability concerns because she was not a "medical expert" and sought to change the form. Lombardo prohibited "any modifications" but offered Nielsen the chance to retract her signature, which she chose not to do. Nielsen was issued a Summary of Counseling for being "argumentative and uncooperative."

Later the same month, an SI was opened because Nielsen commented on a CO's height and stature during a training session, which another CO reported as offensive. After she admitted making the comment, Nielsen was issued a Summary of Counseling for making demeaning comments.

On August 22, 2018, Nielsen gave a statement to the Cape May County Prosecutor's Office (Prosecutor's Office), claiming Magill was stealing time by

not working full shifts. She had conducted an unauthorized investigation of Magill with other COs. She admitted to the Prosecutor's Office that during work hours she reviewed internal surveillance video of Magill and accessed the CMCSO timekeeping system without authorization to document discrepancies in Magill's hours. While Nielsen and other COs investigated Magill during work hours, they had separate civil litigation against the County.

After the Prosecutor's Office independently investigated Magill, it "refer[red] th[e] complaint to the [CMCSO] . . . for their administrative review," and did not file charges. Because Nielsen had conducted the investigation during work hours and accessed the CMCSO's internal systems without authorization, she was charged with incompetency, inefficiency, or failure to perform duties, N.J.A.C. 4A:2-2.3(a)(1); conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6); neglect of duty, N.J.A.C. 4A:2-2.3(a)(7); misuse of public property, N.J.A.C. 4A:2-2.3(a)(8); and other sufficient causes, N.J.A.C. 4:2-2.3(a)(12), related to conduct that violates CMCSO rules and regulations, withholding information, standard of conduct, neglect of duty, obedience to laws and regulations, and truthfulness.

After an IA investigation and a hearing, the hearing officer recommended that the charges of conduct unbecoming a public employee and neglect of duty

11

and the charge of "not following the Sheriff's Office rules and regulations" be sustained with a "five (5) day suspension." The remaining charges were to be dismissed. Nielsen alleged the discipline was retaliation for reporting Magill's actions to the Prosecutor's Office.

In October 2018, Nielsen and other COs were the subjects of an IA investigation based on excessive internet use on non-jail matters during work hours. After the IA investigation she and other COs were disciplined. The CMCSO established Nielsen was in violation of misuse of public property, N.J.A.C. 4A:2-2.3(a)(8); neglect of duty, N.J.A.C. 4A:2-2.3(a)(7); conduct unbecoming of a public employee, N.J.A.C. 4A:2-2.3(a)(6); other sufficient cause, N.J.A.C. 4A:2-2.3(a)(12); including CMCSO's rules and regulations regarding standard on conduct, neglect of duty, and the internet use policy. After she appealed the finding and before a trial, the matter was settled.

In November 2018, Maher requested an IA investigation against four Sergeants and three COs for improperly accessing an IA file. As Nielsen did not open the file, no violation was found. On December 18, 2018, she was asked to complete a special report regarding an SI but no discipline resulted. Thereafter, on December 22, 2018, Nielsen was ordered to work after COs called out sick, which she believed was a wrongful request.

12

In January 2019, Nielsen requested a personal day off in February. She allegedly did not receive a timely response, and the request was denied due to overtime issues, which she believed were false. The same month, the new jail opened. Nielsen believed there were staffing issues in the new facility.

In February 2019, Terinoni observed Nielsen at work after her shift had ended. She explained to him that she was working overtime as a rover. He questioned why she was not wearing the necessary rover equipment and was in an office with her husband, not working. Nielsen was required to submit a report, had to review the video showing she did not perform the responsibilities of a rover, and was issued a Summary of Counseling.

In March 2019, Nielsen was exonerated after an IA investigation was completed regarding an inmate's complaint. In July, 2019, Prince requested that she and another CO submit special reports related to another CO's disclosed concerns with the squad. Nielsen was not disciplined. Sometime in 2020, she reported being kicked by an inmate. COs on the shift initially supported Nielsen's account, confirming she was kicked. Because the outcome determined whether criminal charges could be brought against the inmate, Magill reviewed the footage and determined Nielsen was not kicked. While Nielsen disputed what occurred, Magill had the COs review the video footage in Magill's and

13

Nielsen's presence, which resulted in the COs filing supplemental reports that retracted their initial accounts.

On May 30, 2019, Nielsen filed a CEPA complaint, which defendants answered. She amended her complaint on April 1, 2021, alleging CEPA claims based on her alleged protected activity of complaining about possible staffing issues in the new jail and Magill's stealing time. After the conclusion of discovery, defendants moved for summary judgment and Nielsen filed opposition. After argument, the court issued an order accompanied by a written decision granting summary judgment dismissal of Nielsen's complaint.

The court found Nielsen's alleged protected activity of reporting speculative future staffing violations by CMCSO, concerning the new jail that was not yet built, was "conjecture" and could not "be the basis for a CEPA claim." The court further determined Nielsen's claim was unsupported because she did not have "an objectively reasonable belief that manpower was not going to be sufficient" and highlighted there was no "employer conduct to report or object to." The court also declined to consider two new "instances of protected conduct" that Nielsen failed to plead.[2]

---

[2] We note Nielsen does not challenge the court's finding regarding the additional protected conduct claims she did not plead.

14

Regarding Nielsen's alleged protected activity of reporting Magill for stealing time, the court found "it was whistle[]blowing activity." It found only defendants' actions after Nielsen reported Magill's alleged misconduct in August 2018 "could possibly be [considered] adverse employment action." The court addressed each of Nielsen's alleged incidents of retaliation by defendants. The court determined "[i]n most cases, Nielsen was exonerated" or "no discipline resulted." The court found it relevant she admitted in one instance "not following procedures and . . . was disciplined" and that no alleged retaliation actions impacted her "compensation or rank." Further, it reasoned "[t]here is no pattern where Nielsen was . . . subject to discipline" and rejected that the opened investigations could be viewed as retaliation. After the court determined Nielsen failed to show an adverse employment action, it found she did not "present any evidence of a causal connection." This appeal followed.

On appeal, Nielsen contends reversal is warranted because the court committed the following errors: (1) determining, as a matter of law, that Nielsen did not engage in protected conduct when reporting manpower safety issues for the new jail; (2) failing to accurately consider what constitutes unlawful CEPA retaliation and that Nielsen was subjected to unlawful retaliation for her CEPA protected conduct; (3) determining Nielsen failed to demonstrate a sufficient

causal link between her protected conduct and the retaliatory adverse employment actions she suffered; (4) finding Nielsen presented insufficient evidence demonstrating defendants' asserted legitimate, nonretaliatory reasons are pretext for retaliation; (5) dismissing her punitive damages claim; and (6) finding defendant met the summary judgment standard.

## II.

Our review of a trial court's summary judgment decision is de novo. DeSimone v. Springpoint Senior Living, Inc., 256 N.J. 172, 180 (2024); see also R. 4:46-2(c). "The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)). "A dispute of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Gayles v. Sky Zone Trampoline Park, 468 N.J. Super. 17, 22 (App. Div. 2021) (quoting Grande v. Saint Clare's Health Sys., 230 N.J. 1, 24 (2017)).

A-3011-23

"Summary judgment should be granted 'if the discovery and any affidavits show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" DeSimone, 256 N.J. at 180-81 (quoting Perez v. Professionally Green, LLC, 215 N.J. 388, 405 (2013)) (internal quotation marks omitted). Insubstantial arguments based on assumptions or speculation are not enough to overcome summary judgment. Brill, 142 N.J. at 529; see also Dickson v. Cmty. Bus Lines, Inc., 458 N.J. Super. 522, 533 (App. Div. 2019) ("'[C]onclusory and self-serving assertions by one of the parties are insufficient to overcome' a motion for summary judgment.") (quoting Puder v. Buechel, 183 N.J. 428, 440-41 (2005)). A proffered self-serving statement, on its own, does not incontrovertibly create a material issue of fact. See Miller v. Bank of Am. Home Loan Servicing, L.P., 439 N.J. Super. 540, 551 (App. Div. 2015).

"The Legislature enacted CEPA to 'protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.'" Allen v. Cape May County, 246 N.J. 275, 289 (2021) (quoting Dzwonar v. McDevitt, 177 N.J. 451, 461 (2003)). CEPA prohibits employers from retaliating against employees who perform a whistleblowing activity. N.J.S.A. 34:19-13. CEPA "is considered

A-3011-23

remedial legislation entitled to liberal construction." Lippman v. Ethicon, Inc., 222 N.J. 362, 378 (2015). Pursuant to N.J.S.A. 34:19-5, "an aggrieved employee or former employee may, within one year, institute a civil action" claiming a CEPA violation. Under the continuing violation doctrine, "[w]hen an individual is subject to a continual, cumulative pattern of tortious conduct, the statute of limitations does not begin to run until the wrongful action ceases." Shepherd v. Hunterdon Dev. Ctr., 174 N.J. 1, 18 (2002) (quoting Wilson v. Wal-Mart Stores, 158 N.J. 263, 272 (1999)). The continuing violation doctrine may be applied in CEPA cases. Green v. Jersey City Bd. of Educ., 177 N.J. 434, 448 (2003).

To establish a prima facie CEPA claim, a plaintiff must demonstrate:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle[]blowing" activity described in N.J.S.A. 34:19-3(c); (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle[]blowing activity and the adverse employment action.
>
> [Allen, 246 N.J. at 290 (quoting Dzwonar, 177 N.J. at 462).]

To satisfy the first element of a CEPA claim, a plaintiff "must identify a statute, regulation, rule, or public policy that closely relates to the complained-of conduct." Dzwonar, 177 N.J. at 463. A plaintiff "need not show that his or

her employer or another employee actually violated the law or a clear mandate of public policy." Id. at 462. A plaintiff must only show that he or she "'reasonably believe[d]' that to be the case." Ibid. (quoting Est. of Roach v. TRW, Inc., 164 N.J. 598, 613 (2000)).

CEPA's second element requires a plaintiff to establish "he or she performed a 'whistle[]blowing activity' described in N.J.S.A. 34:19-3(c)." Lippman, 222 N.J. at 380. An employee performs a protected whistleblowing activity if he or she:

> a. Discloses or threatens to disclose to a supervisor or to a public body an activity, policy[,] or practice of the employer . . . that the employee reasonably believes:
>
> > (1) is in violation of a law, or a rule or regulation promulgated pursuant to law. . . ; or
> >
> > (2) is fraudulent or criminal . . . ;
>
> . . . .
>
> c. Objects to, or refuses to participate in any activity, policy[,] or practice which the employee reasonably believes:
>
> > (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ;
> >
> > (2) is fraudulent or criminal . . . ; or

19

> (3) is incompatible with a clear mandate of public policy concerning the public health, safety[,] or welfare or protection of the environment.
>
> [N.J.S.A. 34:19-3(a), (c).]

Under the third CEPA element, a plaintiff must demonstrate he or she suffered an adverse employment action. Lippman, 222 N.J. at 380. CEPA defines retaliation as "the discharge, suspension[,] or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e). "What constitutes an 'adverse employment action' must be viewed in light of the broad remedial purpose of CEPA, and [a court's] charge to liberally construe the statute to deter workplace reprisals against an employee speaking out against a company's illicit or unethical activities." Donelson v. DuPont Chambers Works, 206 N.J. 243, 257-58 (2011).

Finally, to satisfy the fourth element of CEPA, a plaintiff must demonstrate "a causal connection . . . between the whistle[]blowing activity and the adverse employment action." Dzwonar, 177 N.J. at 462. A causal connection "can be satisfied by inferences that the trier of fact may reasonably draw based on circumstances surrounding the employment action." Maimone v. City of Atlantic City, 188 N.J. 221, 237 (2006). "The temporal proximity of

employee conduct protected by CEPA and an adverse employment action is one circumstance that may support an inference of a causal connection." Ibid.

Once a plaintiff establishes a prima facie case under the four CEPA elements, the burden shifts to a defendant to "advance a legitimate, nondiscriminatory reason for the adverse conduct against the employee." Klein v. Univ. of Med. & Dentistry of N.J., 377 N.J. Super. 28, 38 (App. Div. 2005); see also Allen, 246 N.J. at 290-91. Once an employer proffers a legitimate reason, "plaintiff has the ultimate burden of proving that the employer's proffered reasons were a pretext for the discriminatory action taken by the employer." Allen, 246 N.J. at 291 (quoting Kolb v. Burns, 320 N.J. Super. 467, 478 (App. Div. 1999)).

## III.

We first address Nielsen's contention that the court erred in finding her March 2017 reports, which expressed concerns regarding the CMCSO's staffing in the future for the jail not yet built, were not protected whistleblowing conduct under CEPA. Having reviewed the record de novo, in the light most favorable to Nielsen, we conclude she has failed to demonstrate under CEPA a genuine issue of material fact supporting that her expressed future manpower concerns are protected disclosures of a violation.

A-3011-23

Nielsen concedes she "objected to the lack of manpower" for the future jail facility that the County had not built. Further, the new jail was not completed for almost another two years after her submitted reports. Undisputedly, there are well-recognized policies concerning jail staffing. However, Nielsen has failed to demonstrate a material fact supporting her reasonable belief that defendants' "conduct was violating" any staffing mandates. Dzwonar, 177 N.J. at 462. Stated another way, her reports concerning possible prospective staffing issues cannot be fairly viewed as "blow[ing] the whistle on illegal or unethical activity committed by" defendants. Est. of Roach, 164 N.J. at 609-10. We thus agree with the court that Nielsen has failed to present a genuine issue of material fact that her reporting of future staffing concerns constitutes protected activity.

We next turn to address Nielsen's CEPA claim based on the alleged protected activity of reporting Magill's purported misconduct. The court found Nielsen met the first two CEPA elements. In according Nielsen all permissive inferences, we agree she has demonstrated sufficient facts to support CEPA's first and second elements because she reported her good faith belief that Magill failed to work required hours. Nielsen alleged sufficient facts that Magill

22

appeared to violate the CMCSO work policies and, therefore, her statement to the Prosecutor's Office was protected whistleblowing activity.

We next review Nielsen's alleged claims of adverse employment actions under CEPA's third element. In reviewing Nielsen's alleged employment actions taken by defendants after her August 2018 reporting of Magill, we agree with the court that, when viewing each separately, she has failed to demonstrate a prima facie showing that defendants committed a single adverse employment action. However, after cumulatively reviewing her alleged retaliatory incidents, we part ways with the court's finding that she did not establish a prima facie showing of an adverse employment "pattern of harassment."

Retaliation "need not be a single discrete action." Green, 177 N.J. at 448. It is well recognized that "many separate but relatively minor instances of behavior directed against an employee that [are not] actionable individually" may combine to show "a pattern of retaliatory conduct" and "constitute an adverse employment action." Nardello v. Township of Voorhees, 377 N.J. Super. 428, 435 (App. Div. 2005) ("[W]hile plaintiff was not discharged, suspended[,] or demoted, when the facts are viewed in a light most favorable to him, a jury could draw an inference that he suffered a series of adverse retaliatory actions by his employer.").

Nielsen sufficiently demonstrated that multiple investigations were opened against her over a period of almost two years after her protected activity of reporting Magill to the Prosecutor's Office in 2018. Specifically, Nielsen alleged she was subjected to the following incidents that, when viewed cumulatively, create a material issue of fact regarding a pattern of retaliatory conduct: the suspension after an IA investigation and hearing related to her unauthorized examination of Magill's work hours on the CMCSO's internal systems; the IA investigation finding she excessively used the internet on non-work related matters and subsequent discipline; the Summaries of Counseling received after an SI related to her comments involving another CO's stature; the investigation into her failure to perform rover duties; and the other performance reviews of her work. These actions cumulatively, when viewed in the light most favorable to Nielsen, support a prima facie showing under CEPA's third adverse employment element of adverse employment actions.

We next turn to Nielsen's argument that she has demonstrated a causal connection between her alleged whistleblowing activity and defendants' adverse employment actions under CEPA's fourth element. While she asserts adverse employment actions by defendants, she offers no genuine material dispute that defendants' actions were workplace reprisals taken in response to her August

24

2018 protected activity. We note she offers no facts rebutting the discipline she received after the IA investigations. Further, Nielsen's statement that she was "a model employee" and that the SIs conducted were "dubious" is not supported by the record. She acknowledged multiple times that there were instances when her conduct and work performance fell short of what was required under the CMCSO's policies. Simply reciting that workplace investigations and incidents occurred does not create a causal nexus to her protected activity. Further, under the present facts, the temporal proximity of Nielsen's reporting and defendants' actions alone does not support an inference of a causal connection.

For these reasons, we conclude Nielsen has shown no genuine issue of material fact supporting "a causal connection . . . between the whistle[]blowing activity and the adverse employment action." Dzwonar, 177 N.J. at 462. "[A]ccepting all [Nielsen's] allegations as true," the court correctly found she failed to present any evidence of a causal connection between the protected activities of reporting Magill and her alleged retaliatory investigations by defendants. We agree that mere assertions of a causal connection are insufficient to overcome summary judgment. See Dickson, 458 N.J. Super. at 533. ("'[C]onclusory and self-serving assertions by one of the parties are

insufficient to overcome' a motion for summary judgment." (quoting Puder, 183 N.J. at 440-41)).

Finally, as we have concluded Nielsen has failed to establish a prima facie showing of a CEPA claim, we need not address her remaining arguments. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division